# IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT COURT OF APPEALS

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,
*Plaintiffs-Appellees*,

*v.*

D.B.U., *et al.*,
*Defendants-Appellants*.

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLORADO
No. 1:25-cv-01163
The Hon. Charlotte N. Sweeney

## EMERGENCY MOTION FOR A STAY PENDING APPEAL

YAAKOV M. ROTH
Acting Assistant Attorney
General

DREW C. ENSIGN
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Deputy Director

TIM RAMNITZ
Senior Litigation Counsel
United States Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20530
Phone: (202) 616-2686
e-Mail: Tim.Ramnitz@usdoj.gov

**CERTIFICATE UNDER 10th Cir. R. 8.2**

(1)    This motion was not filed earlier because the District Court's final temporary restraining order was issued one day ago, on April 22, 2025.

(2)    The underlying orders were entered April 14th and April 22, 2025.

(3)    The underlying orders are currently effective.

(4)    Tim Ramnitz, Attorney, Office of Immigration Litigation
Telephone: 202-616-2686
Email: Tim.Ramnitz@usdoj.gov

# INTRODUCTION

Yesterday, a District Court lacking jurisdiction purported to halt the potential transfer of any individual in Colorado—including the two named Petitioner-plaintiffs—who claim they fear removal under the Alien Enemies Act ("AEA"), and to impose onerous notice requirements on the Department of Homeland Security prior to exercise of that key Presidential authority. Those impositions interfere with the President's core authority to protect the nation, and are inconsistent with the Supreme Court's discussion of AEA notice requirements. These irreparable harms, coupled with the fact that the district court's orders extend beyond 14 days, make the district court's order appealable. And a stay pending appeal is manifestly warranted, as is an immediate administrative stay of the temporary restraining order ("TRO").

Given the importance of the issues presented, the harms caused by the TRO, and the immediate timeframe for the Government to comply with the district court's order, the Government requests a ruling no later than 5pm on **Tuesday, April 29, 2025**.[1]

---

[1] Because of the imminent timeline of the district court's order and because of the importance of the issues presented, the Government will be concurrently seeking a stay pending appeal from the district court. *See* Fed. R. App. P. 8(a)(1).

# BACKGROUND

## I. Invocation of Executive Authority under the Alien Enemies Act, 50 U.S.C. §§ 21–24, against Tren de Aragua Members

The President has found that Tren de Aragua, a transnational criminal organization that originated in Venezuela, operates "both within and outside the United States" and that its "extraordinarily violent" campaign of terror presents "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and has declared a national emergency to respond to that threat. Exec. Order No. 14,157, 90 Fed. Reg. 8439, 8439 (Jan. 29, 2025). On February 20, 2025, the Secretary of State designated Tren de Aragua a Foreign Terrorist Organization. 90 Fed. Reg. 10,030 (Feb. 20, 2025). On March 14, 2025, the President signed a Proclamation ("Proclamation"), invoking his authority under the Alien Enemies Act, 50 U.S.C. §§ 21–24, against Tren de Aragua members. *See* Proclamation No. 10,903, 90 Fed. Reg. 13,033, 13,034 (Mar. 20, 2025); *see also* 50 U.S.C. § 21 (The AEA grants the Executive broad power to remove enemy aliens). In his proclamation, the President announced that "all Venezuelan citizens 14 years of age or older who are members of [Tren de Aragua], are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies" under 50 U.S.C. § 21. *Id*. at 13,034.

## II.  Factual and Procedural Background of this Motion

Plaintiffs, two natives and citizens of Venezuela, are civil immigration detainees who are currently detained pursuant to 8 U.S.C. § 1226(a), and not under the AEA. *See* Exh. A (April 22, 2025, District Court order granting the TRO) at *1. Although Plaintiffs point to indicia in evidence or forms in DHS's possession that they are associates or members of Tren de Aragua, neither of the named Plaintiffs to the suit filed before the District Court have been designated by DHS as members of Tren de Aragua, or "Alien Enemies" under the AEA. *See id.* at *2-3; *see also* Exh. B (Valdez declaration).

Despite neither being detained pursuant to the AEA, or being designated as members of Tren de Aragua, on April 12, 2025, Plaintiffs filed their Class Petition for Writ of Habeas Corpus and Class Complaint for Declaratory and Injunctive Relief, and Emergency Motion for Temporary Restraining Order. *See id.* at *4. In the TRO motion, Plaintiffs sought emergency relief on the grounds that they believed that they were in "imminent danger of being transferred" outside the judicial district "en route to removal," and sought an injunction prohibiting their transfer and "30-day notice of any intent to remove Plaintiffs and the opportunity to contest an alien enemy designation." *See id.* On April 12, 2025, Plaintiffs also filed, *inter alia*, a Motion for Class Certification. *See id.*

### III.    The District Court's Multiple Orders Granting Injunctive Relief

On April 14, 2025, the District Court issued an order prohibiting the Government from removing Plaintiffs "from the District of Colorado or the United States unless or until this Court or the Court of Appeals for the Tenth Circuit" vacated the order. *See* Order, ECF No. 10. Without conducting any sort of class certification procedures, and following an Emergency Motion for Clarification, ECF No. 13, the Court expanded its order to apply to Plaintiffs and "the class they propose to represent"—in other words, it prevented the removal of any immigration detainee in an undefined class from being removed from the District of Colorado. The court also specified that its order would remain in effect for 14 days. *See* Order, ECF No. 14.

On April 22, 2025, the District Court issued a third injunctive order Plaintiffs. *See* Exh. A. First, the Court found that it has jurisdiction over proceedings, rejecting the Government's argument that Plaintiffs challenge their removal under the Proclamation, but are not in fact facing removal or detention under the Proclamation. *Id.* at *5. The Court found that because the named Plaintiffs could potentially be reclassified as "Proclamation-eligible—and removal—detainees" in the future, that they "satisfied the habeas 'in custody' jurisdictional requirement." *Id.* Next, the District Court found that Plaintiffs' claims were justiciable and reviewable, even if neither named petitioner is in fact designated as subject to the Proclamation because the Court found they had demonstrated "a sufficient risk of 'being designated' as

TdA members, and thus f[ell] under the Proclamation, to, at this procedural stage, survive [the Government's] ripeness and standing challenges." The District Court additionally found that the Immigration and Nationality Act does not deprive the Court of authority to enjoin the DHS from transferring Plaintiffs or other class members outside of Colorado. *Id.* at *6. Finally, the District Court ordered:

> Respondents and the government must provide Plaintiffs and the provisionally certified class of individuals they seek to represent: Respondents shall provide a twenty-one (21) day notice to individuals detained pursuant to the Act and Proclamation. Such notice must state the government intends to remove individuals pursuant to the Act and Proclamation. It must also provide notice of a right to seek judicial review, and inform individuals they may consult an attorney regarding their detainment and the government's intent to remove them. Such notice must be written in a language the individual understands.

*Id.* at *1. The order is in effect for an additional 14 days, until May 6, 2025.

## ARGUMENT

### I.    The District Court's Injunctive Orders are Appealable

This Court has jurisdiction to review the district court's series of injunctive orders. Although TROs "are not ordinarily appealable" an order may be treated as an appealable preliminary injunction "even if the district court labels its order a temporary restraining order." *Tooele Cnty. v. U.S.*, 820 F.3d 1183, 1186–87 (10th Cir. 2016) (finding that TROs are ordinarily not appealable, they are appealable where they are "more akin to preliminary injunctive relief."); *see also Garza v. Hargan*, 2017 WL 9854552, at *1 n.1 (D.C. Cir. Oct. 20, 2017), *vacated in part on reh'g en*

*banc*, 874 F.3d 735 (D.C. Cir. 2017), *vacated sub nom. Azar v. Garza*, 584 U.S. 726 (2018); *see Belbacha v. Bush*, 520 F.3d 452, 455 (D.C. Cir. 2008) (treating denial of temporary restraining order as "'tantamount to denial of a preliminary injunction'"). That is true here for two reasons.

*First*, the Court's series of orders preventing application of the AEA in Colorado extend well beyond 14 days. As this Court has held, "[w]hen a temporary restraining order lasts longer than fourteen days, it becomes appealable as a preliminary injunction." *Tooele Cnty.*, 820 F.3d at 1187 (citing *Sampson v. Murray*, 415 U.S. 61, 86-87 (1974)). The Court's first order issued on April 14, 2025. Its final order remains in place until May 6, 2025—*i.e.*, over 14 days. These orders have functioned together to prevent the President's enforcement of the AEA in the District of Colorado—a jurisdiction rife criminal TDA activity. The orders are therefore appealable. Moreover, the April 22, 2025, Order purports to impose a *21-day* notice requirement on DHS—a requirement that itself exceeds the district court's authority to issue a temporary order that freezes the status quo for only 14 days. Because the court's orders extend beyond the limited period of a TRO, they are immediately appealable. Such action divests the Executive of a key foreign affairs and national security authority oriented towards effectuating removal of individuals linked to a designated FTO—efforts that may be forever stymied if halted even temporarily. The Supreme Court has stressed that a district court cannot "shield its orders from

appellate review merely by designating them as temporary restraining orders, rather than as preliminary injunctions." *Sampson*, 415 U.S. at 87.

*Second*, the district court halts the invocation of the AEA anywhere in Colorado. In doing so, it works an extraordinary harm to the President's authority under the AEA and his inherent Article II authority to promptly repel such an invasion and conduct foreign affairs. Both the Supreme Court and the D.C. Circuit accepted appellate jurisdiction over impositions on this authority even where the order at issue was in effect for only 14 days. *See J.G.G.*, 2025 WL 1024097. *A fortiori*, there is appellate jurisdiction in this case. Indeed, federal courts have consistently held that the determination by the Executive of whether there is an "invasion" is a nonjusticiable political question. *See*, *e.g.*, *State of California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (collecting cases). And as the Supreme Court has long recognized, federal courts have no authority to issue an injunction purporting to supervise the President's performance of his duties. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) ("[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties."). The discretion afforded the President in this context, and the court's lack of authority to hinder the exercise of that discretion, is especially plain under the AEA: "[t]he authority of the President to promulgate by proclamation or public act 'the manner and degree of the restraint to which they (alien enemies) shall be subject,

and in what cases,' is, of course, plenary and not reviewable." *Ex parte Gilroy*, 257 F. 110, 112 (S.D.N.Y. 1919). The D.C. Circuit has identified the significance of the harm that a TRO poses to the Executive Branch as a relevant factor in determining the appealability of a TRO. *See Adams v. Vance*, 570 F.2d 950, 953 (D.C. Cir. 1978) (permitting appeal of a TRO that "commanded an unprecedented action irreversibly altering the delicate diplomatic balance in the environmental arena").

## II. The Government Has a Strong Likelihood of Success on Appeal

### A. The District Court Erred in Issuing the TRO Because It Lacked Jurisdiction over the Case

The District Court erred in issuing the TRO because it lacked jurisdiction to do so. The Supreme Court held in *J.G.G.* that the sole avenue for a person challenging removal under the AEA is in habeas. *See J.G.G.*, 2025 WL 1024097, at *1 ("Challenges to removal under the AEA … must be brought in habeas"). Such challenges must proceed in habeas "[r]egardless of whether the detainees formally request release from confinement, because their claims for relief necessarily imply the invalidity of their confinement and removal under the AEA...." *Id*. (cleaned up). Here, Plaintiffs did not identify the habeas statute, 28 U.S.C. § 2241, as a basis of jurisdiction. *See* Exh. A at *5. Instead, Plaintiffs challenged their removal under the Proclamation, arguing that removal under the Proclamation and the AEA would be unlawful. *See id*. But Plaintiffs are not facing removal under the Proclamation or the AEA. Before they filed the Petition, ICE had determined, through its review process

based on current information, that Plaintiffs are *not* subject to the Proclamation. *Id.* They were, therefore, not detained or in removal proceedings under the AEA. *Id.*

As a result, this Court lacks jurisdiction over this habeas proceeding. The Supreme Court has held that a court can exercise habeas jurisdiction only where the petitioner challenges a basis for the petitioner's custody. *See Maleng v. Cook*, 490 U.S. 488, 490–91 (1989) (holding that the statutory "in custody" language requires that the habeas petitioner, at the time his petition is filed, be in custody under the conviction or sentence the petitioner is attacking). In *Maleng*, the Court held that the mere "possibility" that an order of conviction will result in future custody is not enough to serve as a basis for habeas jurisdiction. *Id*. at 492 (a habeas petitioner is not "in custody" for purposes of habeas jurisdiction under a conviction "after the sentence imposed for it has fully expired, merely because of *the possibility* that the prior conviction will be used to enhance the sentences imposed for any subsequent crimes of which he is convicted") (emphasis added). While *Maleng* addressed a habeas petition filed under 28 U.S.C. § 2254, "this 'in custody' requirement appears in both §§ 2241(c)(3) and 2254(a)." *Alaska v. Wright*, 593 U.S. 152 (2021) (applying *Maleng* to a habeas petition filed under both § 2241 and 2254).

Since *Maleng*, the Tenth Circuit has recognized that habeas petitions must be dismissed for lack of jurisdiction where the petitioner seeks to challenge a conviction that is not a basis of the petitioner's restraint on liberty. *See Mays v. Dinwiddie*, 580

F.3d 1136, 1141 (10th Cir. 2009) (affirming dismissal of habeas petition and explaining that "like the petitioner in *Maleng*, Mr. Mays suffers no present restraint from [the burglary] conviction.' … He therefore cannot establish that he is in custody on that conviction."); *Davis v. Roberts*, 425 F.3d 830, 834 (10th Cir. 2005) ("To the extent that Mr. Davis raises a claim challenging the execution of his 1991 sentence, the district court lacked jurisdiction to hear the claim because he was no longer in custody under that sentence when he filed for relief in that court"; affirming dismissal of petition filed under § 2241).

This principle accords with the Supreme Court's broader recognition that a district court cannot exercise habeas jurisdiction under § 2241 based on events that have not in fact occurred. *See Rumsfeld v. Padilla*, 542 U.S. 426, 448 (2004) ("The dissent cites no authority whatsoever for its extraordinary proposition that a district court can exercise statutory jurisdiction based on a series of events that did not occur, or that jurisdiction might be premised on 'punishing' alleged Government misconduct.").

Because ICE has determined that Plaintiffs are not subject to the Proclamation and is not holding them in detention or removing them under the Proclamation or the AEA, the Court lacks habeas jurisdiction over this case challenging removal under the AEA.

Furthermore, the arguments for Plaintiffs' TRO Motion were speculative, premature, and unripe. They rested on concerns about whether and how the Proclamation might be applied to them in the future and whether they would be permitted to assert various procedural rights in some future proceeding. They raised concerns that any notice that might be issued to them might not comply with due process, or that the ensuing process then might deprive them of other relief (asylum, withholding of removal, or protection under the Convention Against Torture) that they might be seeking to pursue at that point, *id*. at 17-18, or that the process might also violate other procedural rights, *id*. at 19-20. But none of these speculations provide a basis for this Court to exercise jurisdiction. Federal courts cannot issue relief based on mere speculation about a potential future procedural harm. *Cf. Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (no standing to challenge threatened injury absent showing of a "concrete, particularized, and actual or imminent" harm); *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 416 (2013) (no relief for threatened injury absent a showing of "future harm" that is "certainly impending").

**B.      Plaintiffs' Facial Challenges To The AEA Proclamation Fail**

Plaintiffs cannot succeed on the merits of their claim because the District Court lacks jurisdiction over their habeas claims. In any event, the district court erred in accepting Plaintiffs' facial challenges to the President's AEA Proclamation.

### 1. The Proclamation comports with the requirements of the statute

In all events, the Proclamation and its implementation are clearly lawful. The AEA grants the President discretion to issue a proclamation directing the apprehension, restraint, and removal of alien enemies when two conditions are met. First, there either must be "a declared war," "invasion," or a "predatory incursion" that is "perpetrated," "attempted," or "threatened against the territory of the United States." 50 U.S.C. § 21. And second, that hostile action must be by a "foreign nation" or "government." *Id.*

The President's determinations that these statutory preconditions have been satisfied are not subject to judicial review: "The very nature of the President's power to order the removal of all enemy aliens rejects the notion that courts may pass judgment upon the exercise of his discretion." *Ludecke v. Watkins*, 335 U.S. 160, 164 (1948). Indeed, " "[u]nreviewable power in the President … is the essence of the Act." *Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946). But even if the President's determinations were reviewable, the Proclamation validly invoked the AEA here.

*First,* TdA is clearly perpetrating an invasion *or* a predatory incursion into the United States. Although the definition of "invasion" most easily applies to a *military* entry and occupation of a country, the accepted definition of that term is far broader. An invasion is "[a]n intrusion or unwelcome incursion of some kind; esp., the hostile

or forcible encroachment on another's rights," or "[t]he arrival somewhere of people or things who are not wanted there." Black's Law Dictionary, "Invasion," (12th ed. 2024). Nor is there any requirement that the purposes of the incursion are to possess or hold territory of the invaded country. *See*, *e.g.*, *United States v. Texas*, 719 F. Supp. 3d 640, 681 (W.D. Tex. 2024). Here, the actions of TdA fit accepted conceptions of what constitutes an invasion. *See* Proclamation. Their illegal entry into and continued unlawful presence in the United States is an "unwelcome intrusion" of a foreign government linked entity that additionally entails hostile acts that are contrary to the rights of U.S. citizens to be free from criminality and violence.

Even if the actions of TdA do not fall within the broad definition of "invasion," they still constitute a "predatory incursion" that would justify invocation of Section 21. The phrase "predatory incursion" encompasses (1) an entry into the United States, (2) for purposes contrary to the interests or laws of the United States. *See*, *e.g.*, *Amaya v. Stanolind Oil & Gas Co.*, 62 F. Supp. 181, 189-90 (S.D. Tex. 1945) (noting use of the phrase to describe raids in Texas during hostilities with Mexico in the 1840s that fell well short of "invasion"); *see also Davrod Corp. v. Coates*, 971 F.2d 778, 785 (1st Cir. 1992) (using the phrase to refer to foreign fishing fleets unlawfully entering and fishing in U.S. territorial waters).

Here, there is no question that TdA and its members have effected entries into the United States. Nor is there any question that the purposes of that entry are contrary to both the interests and laws of this country—trafficking in substances and people, committing violent crimes, and conducting business that benefits a foreign government whose interests are antithetical to the United States. *See* Proclamation. However else the actions of TdA can be characterized, they clearly constitute a "predatory incursion" into the United States.

Beyond the statute, the the district court's order inappropriately intrudes into the President's inherent Article II authority. The Constitution vests the President with the broad obligation to protect the nation. *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936). Pursuant to that authority, the President may determine that TdA represents a significant risk to the United States, that it is intertwined and advancing the interests of a foreign government in a manner antithetical to the interests of the United States, and that its members should be summarily removed from this country as part of that threat. As the Supreme Court has repeatedly held, Article II confers upon the President expansive authority over foreign affairs, national security, and immigration. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588 (1952). And where, as here, "the President acts pursuant to an express or implied authorization of Congress," *i.e.*, 50 U.S.C. § 21, coupled with the President's own Article II powers over foreign affairs and national security, "his

authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (similar).

If anything, this authority is heightened in the context presented by this case. The Supreme Court has consistently recognized the "accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). Thus, "[w]hen Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an *inherent executive power*." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) (emphasis added).

*Second,* the Proclamation properly recognizes that TdA qualifies as a "foreign nation or government." TdA's close and intimate connections with the Maduro regime, and its infiltration of key elements of the Venezuelan state, including military and law enforcement entities, make it sufficiently tied to Venezuela so as to be within the scope of the AEA. *See* Proclamation. TdA's growth itself can be attributed to state sponsorship and promotion via the actions of former Governor of

Aragua Tarcek El Aissami. *See* Proclamation. And the Maduro regime's connections to the group, via the state-sponsored narco-terrorism enterprise Cartel de los Soles, are also clear. *Id.*

The Maduro regime coordinates with and relies on TdA to "sow violence and discord throughout the United States," including through gang-related crimes and violent attacks such as the murder of Laken Riley in Georgia in February 2024.[2] Given how significantly TdA has become intertwined in the fabric of Venezuela's state structures, it is a de facto arm of the Maduro regime. In such a case, TdA becomes indistinguishable from Venezuela, and the two may be folded together for purposes of invoking Section 21.

As an independent rationale, TdA also operates as a de facto government in the areas in which it is operating. *See* Proclamation. It is well known that the Maduro regime is closely linked to narco-terrorism; a major component of that is "corrupt[ing] the institutions of Venezuela" to flood the United States with drugs "to undermine . . . the wellbeing of our nation" and that Maduro "deliberately deploy[s] cocaine as a weapon."[3] In those areas where it is operating, TdA is in fact operating

---

[2] Peter Pinedo, Fox News, *Tren de Aragua are ideological terrorists disguised as a street gang warns former military officer* (Dec. 13, 2024), https://www.foxnews.com/politics/tren-aragua-ideological-terrorists-disguisedgang-warns-former-military-officer.

[3] Press Release, Dep't of Justice, *Nicolás Maduro Moros and 14 Current and Former Venezuelan Officials Charged with Narco-Terrorism, Corruption, Drug Trafficking*

as a criminal *state*, independent or in place of the normal civil society and government. Given its governance and organizational structure, as well as its de facto control over parts of Venezuela in which it operates with impunity as an effective state unto itself, it would be well within the discretion of the President to determine it constitutes a foreign "government" for purposes of invoking Section 21.

## 2. The AEA notice procedures comport with due process.

In accordance with the Supreme Court's decision in *J.G.G.*, the government has developed procedures for aliens newly subject to the Proclamation. *See J.A.V. v. Trump*, No. 25-cv-00072 (S.D.Tex) at ECF No. 45-4. What process is owed is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Under those procedures, an alien who the government determines is subject to be removed as an alien enemy will receive individual notice of that determination and will be read to them in a language the alien understands. The notice will allow the noncitizen a reasonable time to indicate and then file a petition for a writ of habeas corpus as well as telephone access. This amount of notice has been deemed sufficient in an analogous context.

---

*and Other Criminal Charges* (Mar. 26, 2020), https://www.justice.gov/archives/opa/pr/nicol-s-maduro-moros-and-14-currentand-former-venezuelan-officials-charged-narco-terrorism.

Take expedited removal under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, § 305(a)(3), 110 Stat. 3009-546, 602 (IIRIRA). The entire purpose of IIRIRA was to "substantially shorten and speed up the removal process" for those "who [are] arriving in the United States[,]" or have not shown that they were "physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618–19 (D.C. Cir. 2020) (quoting 8 U.S.C. § 1225(b)(1)(A)(i), (iii)).

If an immigration officer determines that an alien is inadmissible because they do not have valid entry documents, the "officer shall order the alien removed . . . without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i). Even if the individual claims asylum or a fear of persecution, the "process is scarcely more involved" because the immigration officer can quickly deny the claim. *Make the Rd. N.Y.*, 962 F.3d at 618–19 (citing 8 U.S.C. § 1225(b)(1)(B)(iii)(III)). In fact, Congress was explicit on how fast this process was supposed to be: "Review shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination under subclause (I)." 8 U.S.C. § 1225(b)(1)(B)(iii)(III). There is *no* notice requirement for

the very limited habeas review available under this statute. See 8 U.S.C. § 1252(e)(2).

The D.C. Circuit has held that this satisfies due process. *See Am. Immigr. Laws. Ass'n v. Reno*, 18 F. Supp. 2d 38, 58 (D.D.C. 1998), *aff'd*, 199 F.3d 1352, 1357 (D.C. Cir. 2000). This was because the Supreme Court has been clear that "the power to expel or exclude aliens is a fundamental sovereign attribute exercised by the Government's political departments, largely immune from judicial control." *Id.* (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). That logic applies equally here: "[w]hatever the procedure authorized by Congress is, it is due process." *DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)) (holding that expedited removal does not violate the Suspension Clause for similar reasons).

Indeed, much like with the AEA, the Executive has wide "sole and unreviewable discretion" to determine who is subject to the two-year period for expedited removal. 8 U.S.C. § 1225(b)(1)(A)(iii)(I). And like in this case, "'[j]udicial review' of expedited removal orders is only 'available in habeas corpus proceedings'" in limited circumstances. *I.M. v. CBP*, 67 F.4th 436, 437–38 (D.C. Cir. 2023) (quoting 8 U.S.C. § 1252(e)(2)). So if 24 hours suffices to satisfy due process for someone who may have resided in the United States for two years, then surely it is sufficient for those who have been designated enemies of the nation by

the Commander in Chief. Thus, if the government provides at least 24 hours in which to file a petition after an alien has declared an intent to do so, as it has publicly committed to doing, there is no due process issue.

## III. The Other Stay Factors Support Issuance of a Stay

The balance of harms and the equities strongly favor the government here. An injunction was not necessary to protect Plaintiffs. ICE determined, based on the information available, that Plaintiffs are not subject to the Proclamation or the AEA. Even if they were, the government has committed to providing individuals subject to the Proclamation the process they are due—reasonable notice and opportunity to seek relief through habeas corpus. *See J.G.G.*, 2025 WL 1024097, at *2 ("The Government expressly agrees that 'TdA members subject to removal under the Alien Enemies Act get judicial review.'"); Ex. B ¶ 8. . The notice provided under the government policy is fully sufficient for two Plaintiffs given that they have prematurely filed habeas claims and presumably could promptly refile those claims if notified they are subject to the AEA.

The TRO, on the other hand, impedes the government's ability to enforce the immigration laws and to arrest, detain, and remove unlawfully present aliens who may pose a danger to the public, such as TdA members. *See, e.g., Nken*, 556 U.S. at 436 (noting that there "is always a public interest in prompt execution of removal orders," and that interest "may be heightened" where "the alien is particularly

dangerous"). And the court's order is wildly overbroad in seeking to provide relief throughout Colorado, even though no class procedures have been conducted. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (Rule 23 demands a "rigorous analysis").

The TRO also irreparably harms the United States' conduct of foreign policy. It usurps the President's statutory and constitutional authority to address what he has identified as an invasion or predatory incursion. *See Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013) (warning of "the danger of unwarranted judicial interference in the conduct of foreign policy"). The Executive Branch's protection of these interests, including "sensitive and weighty interests of national security and foreign affairs" inherent to combating terrorist groups, warrants the utmost deference. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-35 (2010).

# CONCLUSION

This Court should stay the district court's order pending appeal. To the extent

the Court harbors any doubt about its appellate jurisdiction, it should treat this appeal

as a petition for a writ of mandamus and grant a writ directing the district court to

vacate its order.

Dated: April 23, 2025                    Respectfully submitted,


                                By:    /s/ *Tim Ramnitz*
                                       TIM RAMNITZ
                                       Senior Litigation Counsel
                                       Office of Immigration Litigation
                                       District Court Section
                                       United States Department of Justice
                                       P.O. Box 868, Ben Franklin Station
                                       Washington, DC 20530
                                       Phone: (202) 616-2686
                                       e-Mail: Tim.Ramnitz@usdoj.gov


                                       *Counsel for Defendants-Appellants*

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 5068 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 365 in proportionally spaced 14-point Times New Roman typeface.

/s/ *Tim Ramnitz*
TIM RAMNITZ
Senior Litigation Counsel
Office of Immigration Litigation
District Court Section
United States Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20530
Phone: (202) 616-2686
e-Mail: Tim.Ramnitz@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2025, I electronically filed the foregoing

motion with the Clerk of the Court for the United States Court of Appeals for the

Tenth Circuit by using the appellate CM/ECF system. Participants in the case are

registered CM/ECF users, and service will be accomplished by the appellate

CM/ECF system.

*/s/ Tim Ramnitz*
TIM RAMNITZ

# Exhibit A

2025 WL 1163530
Only the Westlaw citation is currently available.
United States District Court, D. Colorado.

D.B.U. and R.M.M., on behalf of themselves and others similarly situated, Petitioners-Plaintiffs,
v.

DONALD J. TRUMP, in his official capacity as President of the United States: PAMELA BONDI, Attorney General of the United States, in her official capacity; KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MARCO RUBIO, Secretary of State, in his official capacity; U.S. STATE DEPARTMENT; ROBERT GAUDIAN, Director of the Denver Field Office for U.S. Immigration and Customs Enforcement, in his official capacity; and DAWN CEJA, Warden, Denver Contract Detention Facility, in her official capacity, Respondents-Defendants.

Civil Action No. 1:25-cv-01163-CNS
|
filed 04/22/2025

ORDER

Charlotte N. Sweeney United States District Judge

**\*1** Petitioners-Plaintiffs are civil immigration detainees who fear imminent transfer from this judicial district and removal without adequate notice. Their fear is premised on the President's use of the Alien Enemies Act to remove noncitizens from the United States.

Before the Court is Petitioners-Plaintiffs' Emergency Motion for Temporary Restraining Order. ECF No. 2. Following the

Court's April 14, 2025, Order, *see* ECF No. 10, Respondents-Defendants filed their Response to Petitioners-Plaintiffs' Emergency Motion for Temporary Restraining Order on April 17, 2025, ECF No. 26. After considering the parties' written submissions, and having heard oral argument on April 21, 2025, the Court GRANTS Petitioners' Emergency Motion for Temporary Restraining Order.

The Court's Order proceeds as follows. First, it describes this case's legal, factual, and procedural background. Second, it sets forth the legal standard governing the Court's analysis of Petitioners' motion. And third, the Court analyzes Petitioners' motion under that standard. The Court's analysis leads to this conclusion: Petitioners have met their TRO burden.

Because Petitioners have met this burden, the Court orders that Petitioners and members of the provisionally certified class shall not be transferred outside the District of Colorado. The Court orders the following regarding the notice Respondents and the government must provide Petitioners and the provisionally certified class of individuals they seek to represent: Respondents shall provide a twenty-one (21) day notice to individuals detained pursuant to the Act and Proclamation. Such notice must state the government intends to remove individuals pursuant to the Act and Proclamation. It must also provide notice of a right to seek judicial review, and inform individuals they may consult an attorney regarding their detainment and the government's intent to remove them. Such notice must be written in a language the individual understands.

**I. BACKGROUND**

**A. Legal Background**
On March 14, 2025, President Donald J. Trump signed a Proclamation designating Tren de Aragua (TdA) a "Foreign Terrorist Organization" and declaring, among other things, TdA "is perpetuating, attempting, and threatening an invasion or predatory incursion against the territory of the United States." Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. 13,033 (Mar. 14, 2025). The Proclamation's declarations, findings, directions were made

"[p]ursuant to [the President's] authority," *id.*, under 50 U.S.C. § 21—the Alien Enemies Act. *See also* ECF No. 26 at 2.

The Act's history, structure, context, and language is discussed fully below. But for present purposes, it suffices to recite the Proclamation's understanding of the Act: The Act is a law of the United States that "vested in [the President]" the "authority" to "proclaim and direct" that TdA was, as indicated above, invading the "territory of the United States;" its members "are a danger to the public peace or safety of the United States;" and, fundamentally, the power to direct that "all Alien Enemies described in [the Proclamation] are subject to immediate apprehension, detention, and removal." Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. 13,033 (Mar. 14, 2025).

**\*2** Plaintiffs in other jurisdictions have challenged their detention and removals under the Act. *See, e.g., J.G.G. v. Trump*, Civil Action No. 25-766 (JEB), --- F. Supp. 3d ----, 2025 WL 890401, at \*1 (D.D.C. Mar. 24, 2025) ("In the predawn hours of Saturday, March 15, five Venezuelan noncitizens being held in Texas by the Department of Homeland Security sought emergency relief in this Court. They justifiably feared that, in a matter of hours, they might be removed from the country pursuant ... the Alien Enemies Act of 1798."). Following accelerated appellate procedures in the District of Columbia, *see id.*, the Supreme Court issued a unanimous, *per curiam* opinion regarding the "judicial review" to which individuals detained under the Act are entitled. *Trump v. J. G. G.*, No. 24A931, 604 U.S. ----, 2025 WL 1024097, at \*2 (U.S. Apr. 7, 2025); *see also id.* at 2025 WL 1024097, at \*6 ("Begin with that upon which *all nine Members of this Court agree* .... [I]ndividual[s] subject to detention and removal under the [the Act are] entitled to 'judicial review' as to 'questions of interpretation and constitutionality' of the Act ...." (quotations omitted) (Sotomayor, J., dissenting). In sum, individuals "subject to detention and removal" under the Act are entitled to judicial review as to "questions of [the Act's] interpretation and constitutionality," and "must receive notice ... that they are subject to removal under the Act. The notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *J. G. G.*, 2025 WL 1024097, at \*2 (per curiam).

In a different putative class action challenging detainees' removal under the Act filed in the Northern District of Texas, following "an application on behalf of [the] putative class ... seeking an injunction," the Supreme Court recently directed the government "not to remove any member of the putative class of detainees from the United States until further order from" the Supreme Court. *A.A.R.P. v. Trump*, No. 24A1007, - -- U.S. ----, 2025 WL 1147581, at \*1 (U.S. Apr. 19, 2025) (citing 28 U. S. C. § 1651(a)); *see also A.A.R.P. v. Trump*, No. 1:25-CV-059-H, --- F. Supp. 3d ----, 2025 WL 1148140, at \*1 (N.D. Tex. Apr. 17, 2025).

### B. Factual Background

This factual background is drawn predominantly from the parties' TRO briefs and the briefs' supporting exhibits. *See Denver Homeless Out Loud v. Denver, Colorado*, 514 F. Supp. 3d 1278, 1285 (D. Colo. 2021), *vacated and remanded on other grounds*, 32 F.4th 1259 (10th Cir. 2022).

#### *1. Petitioner D.B.U.*

D.B.U. is a Venezuelan citizen who entered the United States through Texas in 2022, and fears returning to Venezuela. ECF No. 2-1 at 1 ¶ 3. He has a single tattoo, which bears his niece's name. ECF No. 2-1 at 1 ¶ 6.

On or about January 26, 2025, Immigration and Customs Enforcement (ICE) arrested D.B.U. ECF No. 2-1 at 1 ¶ 4. At the time of his apprehension, D.B.U. was attending a party. *Id*. ICE and the Drug Enforcement Agency (DEA) characterized the party as a "Tren de Aragua" party in public communications, and accused D.B.U. as being a TdA member. *Id*. Following D.B.U.'s arrest, ICE and DEA agents interrogated him regarding his possible TdA membership. Id. D.B.U. denied—and continues to deny— TdA membership. *Id.*; *see also* ECF No. 2-1 at 1 ¶ 6. D.B.U. has not been criminally charged. ECF No. 2-1 at 1 ¶ 4.

D.B.U. is currently detained at the ICE Denver Contract Detention Facility (the Facility). ECF No. 2-1 at 1 ¶ 2; id. at 2-1 at 1 ¶ 5. In an April 17, 2025, immigration proceeding,

an immigration judge "indicate[d] that ICE suggests that D.B.U. has a gang affiliation." ECF No. 31-2 at 2 ¶ 3. There is a "grave risk of ICE alleging that [D.B.U.] is a member" of TdA, and that ICE will invoke the Act against him. ECF No. 2-1 at 2 ¶ 8.

### 2. Petitioner R.M.M.

R.M.M. is a Venezuelan citizen, born in 2000, who entered the United States at or near Eagle Pass, Texas, in or around 2023. ECF No. 2-2 at 1 ¶ 2. He is married, and has two children, ages six and four. *Id.* R.M.M.'s wife and children live in Aurora, Colorado. *Id.* He has several tattoos for personal reasons, including one of his children's birth years, another of a family member's name, and one tattoo of religious significance. ECF No. 2-2 at 2 ¶ 10.

**\*3** R.M.M. is "extremely afraid" to return to Venezuela. ECF No. 2-2 at 1 ¶ 4. There, he has protested against the "Maduro regime" and has been harmed by groups "aligned with the regime." *Id.* He fled Venezuela because TdA murdered his wife's father and uncle. *Id.* He fears TdA will murder him, his wife, and his children. *Id.* R.M.M. and his family hoped to find "safety and stability" for their family in the United States. ECF No. 2-2 at 1 ¶ 3.

On April 11, 2025, ICE filed a redacted Form I-213 in R.M.M.'s bond case identifying him as an "Associate/Active" of TdA, and stating R.M.M. was a "known member of the Venezuelan gang Tren de Aragua." ECF No. 2-2 at 1 ¶ 5. In support of its Form I-213 contention, ICE recounted the circumstances of R.M.M.'s arrest. ECF No. 2-2 at 2 ¶ 6. On March 1, 2025, an ICE Enforcement and Removal Operations Denver Field Operations Unit conducted surveillance at the address of an individual—not R.M.M.—"allegedly named in a [TdA] investigation. *Id.* (quotations omitted). A person of interest left the addresses and "approach[ed] four Hispanic males ... standing outside their vehicles," one of whom was R.M.M. *Id.* (quotations omitted). ICE determined these individuals, including R.M.M., were "amenable to removal," and arrested them. *Id.* R.M.M. denies connection to ICE's person of interest, and maintains he was only "standing outside [the] vehicles" to meet a prospective buyer for his vehicle, at a public location the buyer selected. *Id.* The Form I-213 also details the search of a Jeep and motel room, to which

R.M.M. denies connection. *See* ECF No. 2-2 at 1–2 ¶ 7. R.M.M. has no prior criminal history or pending charges against him. ECF No. 2-2 at 2 ¶ 9.

R.M.M. is currently detained at the Facility. ECF No. 2-2 at 2 ¶ 8. He is pending immigration removal proceedings, and is pursuing asylum, withholding of removal, and protection under the Convention Against Torture (the Convention) based on his fear of persecution and torture if returned to Venezuela. *Id.* R.M.M. and his wife deny TdA affiliation and seek asylum in part because of past persecution at TdA's hands. ECF No. 2-2 at 2 ¶ 9. There is a "grave risk that ICE will invoke" the Act against him. *Id.* at 2 ¶ 11.

### 3. Petitioners' Immigration Status & Notice

D.B.U. and R.M.M. are presently in removal proceedings before immigration court. *See* ECF No. 26-1 at 4 ¶ 12; *id.* at 5 ¶ 20.

Despite lodging allegations to the contrary during immigration proceedings, ICE "reviewed the facts" in D.B.U.'s case and "determined that he is not subject to the Proclamation," and D.B.U. has "not been issued a notice" that he is subject to the Proclamation. ECF No. 26-1 at 4 ¶¶ 13–14. ICE represents if it "determines in the future that D.B.U. is subject to the Proclamation, he would be provided notice of such determination in a language he understands," and attendant procedures "will allow time and opportunity to file a habeas petition." *Id.* at 4 ¶ 15.

As with D.B.U., ICE has "reviewed the facts" of R.M.M.'s case and "determined that he is not subject to the Proclamation." ECF No. 26-1 at 5 ¶ 21. ICE represents if it "determines in the future that R.M.M. is subject to the Proclamation, he would be provided notice of such determination in a language he understands," and attendant procedures "will allow time and opportunity to file a habeas petition." *Id.* at 5 ¶ 23.

Consistent with these representations, ICE states it "has adopted processes for individuals detained under the [Act] for removal." ECF No. 26-2 at 3 ¶ 7. These processes "require that each individual be provided notice of the proceedings, in a language the alien understands. They allow time and opportunity to file a habeas petition." *Id.* at 3 ¶ 8.

**\*4** The government provides a "Notice and Warrant of Apprehension and Removal Under the Alien Enemies Act" (the Notice) to individuals "determined to be an Alien Enemy and, [who] under [the Act]" are removable pursuant to it. ECF No. 31-1 at 3. The Notice provides "any statement you make now or while you are in custody may be used against you in any administrative or criminal proceeding." *Id.* The Notice clarifies that it "is not a removal order under the Immigration and Nationality Act," and permits that "if you desire to make a phone call, you will be permitted to do so." *Id.* The Notice contains a "Certificate of Service," under which an officer or agent must sign and represent the Notice's recipient was served and the Notice was "read to [the] person in a language he or she understands." *Id.* The Notice is written in English. *See id.* The government has provided no other version of the Notice written in any language other than English.

#### C. Procedural Background

The Proclamation's understanding of what the Act empowers—the powers it "vests"—gives rise to Petitioners' habeas claims and TRO motion.

Fearing "imminent risk of removal pursuant to the Proclamation without any hearing or meaningful review," ECF No. 1 at 14 ¶ 57, on April 12, 2025, Petitioners filed their Class Petition for Writ of Habeas Corpus and Class Complaint for Declaratory and Injunctive Relief, *see generally* ECF No. 1, and Emergency Motion for Temporary Restraining Order, *see generally* ECF No. 2. Consistent with their class petition, in the TRO motion Petitioners seek emergency relief on the grounds that they are in "imminent danger of being transferred" outside this judicial district "en route to removal," and seek an injunction prohibiting their transfer and "30-day notice of any intent to remove Petitioners and the opportunity to contest an alien enemy designation." ECF No. 2 at 1 (emphases removed); *see also id.* at 4 ("Petitioners move the Court for a TRO barring their summary removal under the [Act] and barring Respondents from relocating them outside of this District pending this litigation."). On April 12, 2025, Petitioners also filed their Motion for Leave to Proceed Under Pseudonym, ECF No. 3, and Motion for Class Certification, ECF No. 4.

On April 14, 2025, pursuant to the All Writs Act, the Court issued an order prohibiting Respondents from removing Petitioners "from the District of Colorado or the United States unless or until this Court or the Court of Appeals for the Tenth Circuit" vacated the order. ECF No. 10. The Court ordered Petitioners' counsel to serve Respondents with several documents, including copies of the TRO motion and order. *Id.* The Court ordered Respondents to respond to Petitioners' TRO motion by April 17, 2025, and for both parties to appear for a hearing on April 21, 2025. *Id.* That same day, the Court granted Petitioners' pseudonym motion. *See generally* ECF No. 11. And following Petitioners' Emergency Motion for Clarification, ECF No. 13, the Court stated its prior order prohibited removal of named Petitioners and "the class they propose to represent," to remain in effect for no longer than fourteen days, ECF No. 14.

Respondents timely filed their response to Petitioners' TRO motion on April 17, 2025. ECF No. 26. On April 20, 2025, Petitioners replied. ECF No. 31. The Court heard oral argument on April 21, 2025.

#### II. LEGAL STANDARD

The legal standard governing TROs is the same standard governing preliminary injunctions. *See Nellson v. Barnhart, 454 F. Supp. 3d 1087, 1091 (D. Colo. 2020)* (citation omitted); *Dunlap v. Presidential Advisory Comm'n on Election Integrity, 319 F. Supp. 3d 70, 81 (D.D.C. 2018)* ("Like a preliminary injunction, a temporary restraining order is an extraordinary form of relief."). To prevail on a TRO motion, movants must show: "(1) they are 'likely to succeed on the merits,' (2) they are 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in [their] favor,' and (4) 'an injunction is in the public interest.' " *M.G. through Garcia v. Armijo, 117 F.4th 1230, 1238 (10th Cir. 2024)* (quoting *Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)*). The final two factors "merge" when the government "is the opposing party." *Denver Homeless Out Loud v. Denver, Colorado, 32 F.4th 1259, 1278 (10th Cir. 2022)* (citing *Nken v. Holder, 556 U.S. 418, 435 (2009)*). "An injunction can issue only if each factor is established." *Denver Homeless, 32 F.4th at 1278* (citing *Winter, 555 U.S. at 23–24*)).

### III. ANALYSIS

**\*5** The Court's analysis of Petitioners' TRO motion proceeds in two parts. First, it addresses various threshold issues Respondents raise in their Response. These issues, Respondents assert, preclude judicial review. They do not. Second, the Court considers the TRO factors, and Petitioners' arguments attendant to them, in turn. Their consideration compels the conclusion Petitioners have met their TRO burden.

#### A. Threshold Issues

Before reaching Petitioners' TRO arguments, the Court first addresses the threshold issues Respondents raise—for instance, whether the Court has habeas jurisdiction and Petitioners have standing.

##### 1. Habeas Jurisdiction

Respondents argue that because Petitioners "challenge their removal under the Proclamation" and they are "not facing removal under the Proclamation or the [Act]," that the Court "lacks jurisdiction" over Petitioners' habeas action. ECF No. 26 at 8. Petitioners contend the TRO record and relevant decisional law do "not undermine ... this Court's jurisdiction." ECF No. 31 at 3. The Court agrees with Petitioners.

The parties agreed at oral argument Petitioners' habeas claims impose a jurisdictional requirement. *See* ECF No. 1 at 22 (reciting Petitioners' habeas claim for relief against all Respondents); *Maleng v. Cook*, 490 U.S. 488, 490 (1989) ("The federal habeas statute gives the United States district courts jurisdiction to entertain petitions for habeas relief ..." (citations omitted)). And the parties do not dispute, to meet this requirement, a petitioner must be "in custody" for habeas purposes. *Compare* ECF No. 26 at 8, *with* ECF No. 31 at 5. *See, e.g., Braden v. 30th Jud. Cir. Ct. of Kentucky*, 410 U.S. 484, 488 (1973). Their dispute arises over whether, on the TRO record, Petitioners satisfy this requirement.

Petitioners do. To be sure, Respondents' contention "that habeas petitions must be dismissed for lack of jurisdiction where the petitioner seeks to challenge a conviction that is not a basis of the petitioner's restraint on liberty" is well-

taken. ECF No. 26 at 9. So too are the cases Respondents marshal in support of their jurisdictional argument. *See, e.g.* ECF No. 26 at 8 (citing *Maleng*, 490 U.S. at 490–91). But in the criminal context, petitioners may mount habeas challenges for "sentences ... even though [they are] not presently serving them." *Maleng*, 490 U.S. at 493 (citation omitted); *see also* ECF No. 31 at 5. And cases in that context concluding petitioners failed to meet the habeas custodial requirement—including *Calhoun v. Attorney General of Colorado*, 745 F.3d 1070 (10th Cir. 2014), cited by Respondents' counsel during oral argument—are meaningfully distinguishable. *See Calhoun*, 745 F.3d at 1074 ("It is *undisputed* that Mr. Calhoun was *unconditionally* released from the obligations of his probation before he filed his § 2254 petition. Accordingly, there is no condition of his sentence that *could subject him to reincarceration* or place another restraint on his liberty.") (emphases added); *see also Alaska v. Wright*, 593 U.S. 152, 154 (2021) (applying "in custody" requirement under 28 U.S.C. §§ 2241 and 2254).

The Court turns to the TRO record to expose these meaningful distinctions. *Cf. Calhoun*, 745 F.3d at 1074. Certainly, it is undisputed that D.B.U. and R.M.M. are not "currently"—in the words of counsel—civilly detained pursuant to the Act and Proclamation. *See, e.g.,* ECF No. 2-1 at 2 ¶ 8; ECF No. 2-2 at 2 ¶ 11. But, taking Respondents at their word from oral argument, and certainly from the TRO record, there is no definite evidence ICE will conclude or has concluded Petitioners *do not* fall under the Proclamation's ambit, and are instead subject only to Title 8's immigration removal procedures. *Compare* ECF No. 26-1 at 4–5 ¶¶ (stating for both D.B.U. and R.M.M. that "*[i]f ICE determines in the future* [they] are subject to the Proclamation" then they would receive notice attendant to the Proclamation) (emphasis added), *with Calhoun*, 745 F.3d at 1074 ("[T]here is *no condition* of his sentence that *could* subject him to reincarceration or place *another restraint* on his liberty.") (emphasis added). Simply put, D.B.U. and R.M.M.'s "current" status must be balanced against the possibility of their reclassification as Proclamation-eligible—and removable—detainees, a possibility which Respondents have explicitly declined to foreclose. *See also* ECF No. 31 at 3. This is hardly an evidentiary record where, in light of the "liberal construction" accorded the "in custody" habeas requirement, *Maleng*, 490 U.S. at 492, concluding Petitioners have met their jurisdictional burden

"would read the 'in custody' requirement out of the statute," *id. See also Boumediene v. Bush*, 553 U.S. 723, 780 (2008) ("[T]he common-law habeas court's role was most extensive in cases of pretrial and noncriminal detention, where there had been little or no previous judicial review of the cause for detention.").

**\*6** The Court's conclusion is bolstered—if not compelled— by *A.A.R.P.* and its procedural history. 2025 WL 1147581, at \*1. Recall the Supreme Court directed the government "not to remove any member of the putative class of detainees from the United States until further order of th[e] Court." *Id.* The Supreme Court did so despite the district court's conclusion its petitioners and the putative class failed to show irreparable harm because the government stated it "[did] not presently expect to remove A.A.R.P. or W.M.M. under the [Act] until after the pending habeas petition is resolved." *A.A.R.P.*, 2025 WL 1148140, at \*1 (quotations omitted). Where the Supreme Court has prohibited the government from removing members of a putative class that a district found not to be at risk of imminent or irreparable harm—based on the government's representations— the Court must follow suit. *See United States v. Rose*, 537 F. Supp. 2d 1172, 1177 (D.N.M. 2008) ("[T]his Court is bound to follow the applicable precedent of the Supreme Court." (citations omitted)). Thus, consistent with *A.A.R.P.*, it does not matter for habeas jurisdictional purposes whether Petitioners are or are not "currently" detained pursuant to Proclamation. *See also* ECF No. 31 at 3–4. This is especially the case where such distinction was immaterial to the United States Supreme Court in granting a putative class the same temporary relief Petitioners seek here. *See A.A.R.P.*, 2025 WL 1147581, at \*1.

Accordingly, Petitioners have satisfied the habeas "in custody" jurisdictional requirement. *See* 28 U.S.C. § 2241.

### 2. Justiciable & Reviewable

The parties advance various arguments concerning a fundamental issue: Whether Petitioners' claims are justiciable and reviewable. *Compare* ECF No. 26 at 10, *with* ECF No. 31 at 5. The Court agrees with Petitioners. Their claims are justiciable, and they have met their Article III standing burden. Moreover, "other principles" regarding judicial review identified by Respondents do not bar adjudication of Petitioners' claims. ECF No. 26 at 10.

*First*, Respondents argue Petitioners' claims are "unripe for review," which "bar[s] the Court from reviewing Petitioners' [Act] arguments in the TRO motion." ECF No. 26 at 10. Respondents press the same argument—Petitioners' harms are speculative—in arguing more broadly that Petitioners lack standing. *See id. See also S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1152 (10th Cir. 2013) ("Both standing and ripeness present the threshold jurisdictional question of whether a court may consider the merits of a dispute." (citation omitted)); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (explaining Article III standing requirements). And although the doctrines differ, *see Morgan v. McCotter*, 365 F.3d 882, 890 (10th Cir. 2004), because Respondents premise their arguments regarding each on the same argument and facts, the Court addresses them together, *see, e.g., Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 n.5 (2014).

The "speculative harm" argument echoes Respondents' jurisdictional habeas argument and rings hollow for substantially similar reasons. *See* ECF No. 26 at 10. Based on the TRO record, it is not dispositive that D.B.U. and R.M.M. are not "currently" designated as "subject" to the Proclamation when the government may revise this designation at any time—and failed to eliminate that possibility, or the speed with which such re-designation could occur, when asked directly at oral argument. *Cf.* ECF No. 26-1 at 4 ¶¶ 13–15. At bottom, Petitioners have shown a sufficient risk of "being designated" as TdA members, and thus falling under the Proclamation, to, at this procedural stage, survive Respondents' ripeness and standing challenges. ECF No. 31 at 5. The harms Petitioners face have "matured sufficiently to warrant judicial intervention," *see Morgan*, 365 F.3d at 890 (quotations omitted), surviving Respondents' ripeness challenge. *See also id.* (noting the "ripeness issue, however, focuses *not* on whether the plaintiff *was in fact* harmed" (quotations omitted) (emphases added)). Petitioners have shown there is a "substantial risk that the harm" of being subject to the Proclamation will arise— despite their current designation as individuals who do not fall under it—such that they have met their standing burden. *Susan B. Anthony*, 573 U.S. at 158 ("An allegation of future injury may suffice if ... there is a 'substantial risk' that the harm will occur." (citation omitted)); *Murthy v. Missouri,*

603 U.S. 43, 58 (2024) (same) (quoting *Susan B. Anthony,* 573 U.S. at 158); *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 153–54 (2010). Should their designation change, the Court has grave concerns that Petitioners would be afforded notice that comports with due process to challenge the determination.

**\*7** *Second,* Respondents challenge the Court's ability to "consider Petitioners' request for [ ] review" of the "President's findings and determinations supporting the Proclamation," based on several "limiting principles." ECF No. 26 at 11. The principles Respondents identify pose no limit to the Court's ability to consider Petitioners' claims.

***Presidential Foreign Relations.*** Respondents recite the President's general foreign relations responsibilities and powers, including the power to recognize "foreign states and governments," as powers prohibiting judicial review or injunctive relief. *See* ECF No. 26 at 11. The Court recognizes these powers, but so too must it recognize the Supreme Court's command that Petitioners are entitled, in this habeas proceeding, to judicial review regarding the Act's "interpretation" and its "constitutionality." *J. G. G.,* 2025 WL 1024097, at *2 (quotations omitted) (per curiam). But even without the Supreme Court's binding guidance in *J. G. G.,* the Court would reject Respondents' contention, given that interpreting and assessing the constitutionality of the Act in the context of Petitioners' claims does not amount to "supplant[ing] a foreign policy decision of the political branches ...." *Zivotofsky ex rel. Zivotofsky v. Clinton,* 566 U.S. 189, 196 (2012). *See also J.G.G. v. Trump,* Civil Action No. 25-766 (JEB), --- F. Supp. 3d ----, 2025 WL 890401, at *9 (D.D.C. Mar. 24, 2025) ("A court should not unnecessarily flinch from a justiciable controversy that it has 'a responsibility to decide' simply because the claim arises in the foreign-affairs context.") (quoting *Zivotofsky,* 566 U.S. at 194–201).

***Presidential Power Under the Act.*** Next, Respondents argue the Act itself precludes judicial review. *See* ECF No. 26 at 11. Once again, *J. G. G.* begins and ends the Court's analysis—and rejection—of this argument. *See* 2025 WL 1024097, at *2 (per curiam). But notwithstanding *J. G. G.*'s binding command that Petitioners are *entitled* to mount their interpretive and constitutional challenges, *see Rose,* 537 F. Supp. 2d at 1177, the case Respondents cite in support of this

argument offers no support. *See* ECF No. 31 at 7. *Ludecke* itself—discussed further below—involved judicial review of the Act and facts giving rise to its application. *Ludecke v. Watkins,* 335 U.S. 160, 166 (1948) ("And so *we reach the claim* that while the President had summary power under the Act, it did not survive cessation of actual hostilities." (footnote omitted) (emphasis added)); *J.G.G.,* 2025 WL 890401, at *10; *Citizens Protective League v. Clark,* 155 F.2d 290, 294 (D.C. Cir. 1946) ("The one question, whether the individual involved is or is not an alien enemy, is admitted by the Attorney General to be open *to judicial determination*.") (emphasis added). Decades old decisional law dooms Respondents' argument—to say nothing of the Supreme Court's *per curiam* opinion issued earlier this month. *See Ludecke,* 335 U.S. at 170 (This brings us to the final question. Is the statute valid as we have construed it?").

***Political Question.*** Finally, Respondents argue "the President's findings that the [Act's] preconditions are satisfied is a political question." ECF No. 26 at 12. Citing the District of Columbia's analysis of this precise issue in *J.G.G. v. Trump,* 2025 WL 890401, Petitioners counter "the political question doctrine [does not] preclude" judicial review. ECF No. 31 at 8. The Court agrees with Petitioners. Although the Supreme Court in *J. G. G.* vacated the district court's underlying temporary restraining order, the Supreme Court did *not* disturb the district court's political question analysis. Given this, and the district court's extremely thorough and persuasive analysis in *J.G.G.,* the Court concludes Petitioners' claims do not present a judicially unreviewable political question. *See* 2025 WL 890401, at *9–11; *Baker v. Carr,* 369 U.S. 186, 211 (1962) ("Yet it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.") Respondents err in arguing otherwise. *See J.G.G.,* 2025 WL 890401, *9 ("To the degree that a claim requires the court to interpret a statutory provision or decide a law's constitutionality, the political-question doctrine is not implicated: deciding such questions 'is a familiar judicial exercise.' ") (quoting *Zivotofsky,* 556 U.S. at 196); *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 401 (2024) ("The judiciary is the final authority on issues of statutory construction." (quotations and alterations omitted)).

*3. Immigration & Nationality Act*

**\*8** Finally, in their efforts to forestall asking whether Petitioners have satisfied the relevant factors to secure temporary injunctive relief, *see Nellson*, 454 F. Supp. 3d at 1091, Respondents argue the Immigration and Nationality Act (INA) "deprives the Court of authority to enjoin [them] from transferring Petitioners or putative class members outside" the District of Colorado. ECF No. 26 at 13. The Court notes that, although positioned as threshold matter preceding analysis of the TRO factors in Respondents' brief, *see id.*, Respondents' argument addresses the *relief* the Court can grant, given Petitioners are currently detained under the INA, not the Act and Proclamation. Petitioners discern no obstacles to relief in the INA provisions Respondents identify. *See, e.g.,* ECF No. 31 at 9. The Court agrees with Petitioners.

To make clear, Respondents cannot argue the INA's jurisdictional provisions preclude Petitioners' *habeas* challenge or separately govern removals under the Proclamation and Act. The INA does not reach so far as to prohibit judicial review "as to questions of interpretation and constitutionality" of the Act simply because any case, putative class or class member, or petitioner may implicate or also be involved in Title 8 immigration proceedings. *J. G. G.*, 2025 WL 1024097, at \*1 (quotations omitted) (per curiam). While, on their face, the INA provisions that Respondents cite appear to support their argument, *see, e.g.,* ECF No. 26 at 14, no immigration judge has yet made a removal determination as to either D.B.U. or R.M.M. And moreover, this is not a circumstance where Petitioners seek to restrain any "transfer power" through a "*Bivens* class action suit," *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999), or *review* the decision to detain Petitioners here or elsewhere, *see Tercero v. Holder*, 510 F. App'x 761, 766 (10th Cir. 2013). Petitioners, through habeas, challenge removal proceedings under the Proclamation and Act, implicating the place of their detention only to the extent necessary to adjudicate their *habeas* claims. *Cf. id.*; ECF No. 31 at 9; *Ozturk v. Trump*, No. 2:25-cv-374, --- F. Supp. 3d ---, 2025 WL 1145250, at \*23 (D. Vt. Apr. 18, 2025).

Regardless, the Court is once again bound by the Supreme Court's recent decisions addressing precisely the legal and factual issues this case poses. For instance, in *J. G. G.*, the Supreme Court determined—where petitioners' habeas challenge concerned their detention under the Act—

"jurisdiction lies in only one district: the district of confinement." 2025 WL 1024097, at \*1 (per curiam). Petitioners are detained here. Explained above, the Court has jurisdiction over their claims, *see id.*, and therefore jurisdiction to grant any appropriate relief. *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 248 (1944) ("Equitable procedure has always been characterized by flexibility which enables it to meet new situations which demand equitable intervention, and to accord all the relief necessary to correct the particular injustices involved in these situations."); *Boumediene*, 553 U.S. at 779 ("[C]ommon-law habeas corpus was, above all, an adaptable remedy. Its precise application and scope changed depending upon the circumstances." (citations omitted).

This conclusion is further supported by *A.A.R.P.*, where the district court concluded petitioners did *not* face an imminent threat of removal under the Act, and the Supreme Court *nonetheless* ordered the government "not to remove any member of the putative class of detainees from the United States" until further order. 2025 WL 1147581, at \*1 (citing § 1651(a)). Therefore, *A.A.R.P.* teaches the Court may craft—is *required* to craft—the remedy Petitioners seek, even if named Petitioners are not "currently" detained under the Act and Proclamation. Especially where granting such relief, at *this* stage, is temporary, and ensuring that Petitioners and putative class members remain in this judicial district could be important at later stages of habeas litigation. *Harris v. Nelson*, 394 U.S. 286, 299–300 (1969); *Boumediene*, 553 U.S. at 779.

**\*9** Accordingly, the INA provisions Respondents identify do not, at this stage, preclude the Court from granting Petitioners relief, particularly where doing so would be on a temporary basis. *See, e.g., A.A.R.P.*, 2025 WL 1147581, at \*1.

\* \* \*

Respondents advance several arguments on either side of the merits of Petitioners' claims—against their justiciability, and whether the Court can grant any relief for them. For the reasons set forth above, these arguments do not persuade. And because they do not, the Court proceeds to analyze whether Plaintiffs have met their burden under the factors

governing their request for a temporary restraining order. *See Nellson*, 454 F. Supp. 3d at 1091.

**B. Petitioners' Likelihood of Success on the Merits**

Petitioners advance several arguments regarding their likelihood of success on the merits. The Court considers them in turn.

*1. Proclamation "Satisfying" the Act*

According to Petitioners, the Proclamation exceeds the President's "statutory authority in three critical respects." ECF No. 2 at 11. *First*, there is no "invasion or predatory incursion." *Id. Second*, any purported invasion is not perpetuated by a "foreign government or nation." *Id.* And *third*, there is "no process to contest whether an individual falls within the Proclamation." *Id.* Skepticism of the Proclamation's contrary findings is required, Petitioners urge, to the point of satisfying their first TRO burden. *Id.*; *see also M.G.*, 117 F.4th at 1238. The Court agrees.

*a. Invasion or Predatory Incursion*

Petitioners' first argument, *see* ECF No. 2 at 12, proceeds from a straightforward premise. The President's authority under the Proclamation is "vested" under the Act. The Act demands, as a "statutory requirement," an "invasion or predatory incursion." ECF No. 12; 50 U.S.C. § 21. And because the Act's "text and history" use these terms "to refer to military actions indicative of an actual or impending war"—not "mass illegal migration" or "criminal activities"—the Act cannot sustain the Proclamation. ECF No. 2 at 12–13. The Court agrees with Petitioners.

The Court does not define these words—"invasion," "predatory," and "incursion"—against blank definitional and historic registers. Begin with language. *See, e.g., Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself."). "The term 'invasion' was a legal term of art with a well-defined meaning at the Founding." *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *8 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring); *see also id.* (defining "invasion as a " '[h]ostile entrance

upon the right or possessions of another; hostile encroachment,' such as when 'William the Conqueror invaded England' ") (quoting Samuel Johnson, Invasion, sense 1, A DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773)); (reciting second dictionary defining "invasion as a " 'hostile entrance into the possession of another; particularly the entrance of a hostile army into a country for the purpose of conquest or plunder, or the attack of a military force' ") (quoting Noah Webster, Invasion, sense 1, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)).

**\*10** The Court finds these at-the-Founding definitions persuasive in demonstrating what "invasion" does—and does not—mean as a matter of plain language. "Invasions" contemplate military action. *J.G.G.*, 2025 WL 914682, at *9 ("The term 'invasion' was well known to the Fifth Congress and the American public circa 1798. The phrase echoes throughout the Constitution ratified by the people just nine years before. And *in every instance*, it is used in a military sense.") (Henderson, J., concurring). And at a bare minimum, "invasion" means more than the Proclamation's description of TdA's "infiltrat[ion]," "irregular warfare," and "hostile actions" against the United States—notwithstanding the Proclamation's conclusory description of "the devastating effects of [TdA's] invasion." Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. 13,033 (Mar. 14, 2025). *See also id.* (finding "TdA is undertaking hostile actions and conducting irregular warfare"); *id.* (stating TdA members are "chargeable with actual hostility against the United States").

Definitions of "predatory incursion" likewise reveal a mismatch between what the phrase means and what the Proclamation says. As with the analysis of earlier definitions of "invasion," the Court again finds Judge Henderson's research and analysis of Founding era definitions for "predatory" and "incursion"—which Petitioners cite, and to which they direct the Court—persuasive in its own analysis of Petitioners' TRO motion. *See* ECF No. 2 at 12; *J.G.G.*, 2025 WL 914682, at *10 (Henderson, J., concurring). Explained in Judge Henderson's concurring statement to the D.C. Circuit's *per curiam* order denying emergency stays prior to the Supreme Court's ultimate intervention in *Trump v. J. G. G.*, 2025 WL 1024097, at *1, the "predatory" nature of an "incursion" "includes a '[p]lundering,' such as the

'*predatory* war made by Scotland.' " 2025 WL 914682, at *10 (Henderson, J., concurring) (original alteration and emphasis) (citing Samuel Johnson, Predatory, sense 1, A DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773)).

Indeed, consistent with these definitions, the Supreme Court's discussion of the "power to be exercised by the President such as that conferred by the Act" rests on the presumption the United States is in a "state of war." *Ludecke*, 335 U.S. at 168–69 (quotations omitted); *id.* at 170 n.13 ("[T]he life of [the] statute is defined by *the existence of a war*.") (emphasis added); *id.* at 170 ("The political branch of the Government has not brought *the war with Germany* to an end.") (emphasis added). A year earlier the Second Circuit's analysis of the Act rested on the same premise. *See U.S. ex rel. Kessler v. Watkins*, 163 F.2d 140, 143 (2d Cir. 1947) ("It seems quite necessary to suppose that the President could not carry out prior to the official termination of the declared *state of war*, deportations which the Executive regarded as necessary for the safety of the country but which could not be carried out during *active warfare* because of the danger to the aliens themselves or the interference with the effective conduct of *military operations*.") (emphasis added); *Clark*, 155 F.2d at 295 ("[T]he state of war has not been terminated by act of Congress or by Executive Proclamation.").

Satisfied with what "invasion" and "predatory incursion" mean, the Court could stop. *See Burlington N. R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461 (1987) ("[W]hen we find the terms of a statute unambiguous, judicial inquiry is complete." (quotations omitted)). These words, fundamentally, demand military and wartime action. The Proclamation makes no finding that satisfies these definitional demands. Thus, to the extent the Proclamation relies on the Act's "invasion" and "incursion" provisions to justify its removal powers, it does so improperly. *See J.G.G.*, 2025 WL 914682, at *2 ("A central limit to this power is the Act's conditional clause—that the United States be at war or under invasion or predatory incursion.") (Henderson, J., concurring) (per curiam).

**\*11** But assume these unambiguous words are ambiguous. Turn to history. *See, e.g., United States v. Pub. Utilities Comm'n of Cal.*, 345 U.S. 295, 315 (1953); *United States v. Donruss Co.*, 393 U.S. 297, 303 (1969). As doing so is not

required, *see, e.g., Burlington*, 481 U.S. at 461, the Court does not pause here for long, except to say it finds Petitioners' recitation of the Act's historical context persuasive. *See* ECF No. 2 at 13; *see also J.G.G.*, 2025 WL 914682, at *9 (explaining the Act's historical background) (Henderson, J., concurring); *id.* at *16 ("As James Madison explained, the [Act] was passed based on Congress's 'power to declare war' and was in accord with 'the law of nations.' ") (quoting *The Report of 1800*) (Millett, J., concurring). The Act's history further demonstrates that invasions require the "use [of] military force," *id.* at *9 (Henderson, J., concurring), and any contrary efforts to cramp the Proclamation's findings into that historical meaning fail.

#### b. "Foreign Nation or Government"

Petitioners contend, as with its failures to identify an "invasion" or "predatory incursion," the Proclamation likewise fails to assert a "foreign nation or government" is "invading the United States." ECF No. 2 at 14. The Court agrees with Petitioners. The Court discerns little reason to linger on this point, especially where, as Petitioners observe, the Proclamation finds TdA is "closely aligned with [and] infiltrated[ ] the Maduro regime." Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 FR 13033. The Proclamation does not find TdA *itself* is a foreign nation, country, or government. At bottom, the Proclamation fails to adequately find or assert TdA is a "foreign nation or government," § 21, sufficient to justify the Act's invocation. Indeed, if TdA was such a "foreign nation or government," *id.*, there would be no need for it to "undertak[e] hostile actions ... *at the direction*, clandestine or otherwise, of the Maduro regime in Venezuela," Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 FR 13033 (emphasis added).

#### c. Summary Removals & Notice

Petitioners contend the government has been subjecting individuals to "summary removals without notice." ECF No. 2 at 16 (capitalization omitted); *id.* at 17 (citing *J. G. G.*, 2025 WL 1024097, at *2*)). After reviewing the Notice attached to Petitioners' reply brief, the Court agrees with Petitioners the Notice provided to Petitioners—and,

ostensibly, other detainees in the Facility—is deficient and fails to comport with due process.

Outlined above, the Notice—written in English—provides "any statement you make now or while you are in custody may be used against you in any administrative or criminal proceeding." ECF No. 31-3 at 3. Further that the Notice "is not a removal order under the Immigration and Nationality Act." *Id.* It permits that "if you desire to make a phone call, you will be permitted to do so." *Id.* The Notice contains a "Certificate of Service," under which an officer or agent must sign and represent the Notice's recipient was served and the Notice was "read to [the] person in a language he or she understands." *Id.*

This does not, as discussed during oral argument, instruct individuals that they have a right to pursue a habeas challenge. At most, the Notice "permits" individuals to make "*a* phone call." *Id.* (emphasis added). And while the Notice requires government employees to certify they have *read* the Notice to an individual "in a language he or she understands," this does not guarantee individuals are provided the Notice in a language they understand "in a manner as will allow them to actually seek habeas relief," *J. G. G.*, 2025 WL 1024097, at *2. Vaguely granting someone permission to make one phone call if they ask—with, at most, a verbal read-aloud of the Notice that on its face says nothing about the right to seek habeas relief—does not rise to the level of "allow[ing] [detainees] to *actually* seek habeas relief in the proper venue before [their] removal occurs." *Id.* (emphasis added); *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process ... is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." (citations omitted)). This is all the truer when, as Petitioners observe, the notice gives no timeframe for removal or even informs an individual *how* to contest their removal—much less, noted above, that notice judicial review could be pursued. *See* ECF No. 31 at 4; *Mullane*, 339 U.S. at 314 ("The notice must be of such nature as reasonably to convey the required information ... and it must afford a reasonable time for those interested to make their appearance." (citations omitted)); *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to

be heard at a meaningful time and in a meaningful manner." (quotations omitted)).

**\*12** At bottom, when "notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane*, 339 U.S. at 315. Accordingly, given the TRO record, the Court agrees with Petitioners the notice provided is deficient. *Compare id.*; *and* ECF No. 31 at 3, *with* ECF No. 31-3 at 3.

The parties dispute what notice is required or would be sufficient. On one hand, Respondents contend twenty-four hours is enough. On the other, Petitioners urge the Court to impose a thirty (30) day notice requirement on Respondents and the government. After considering both parties' arguments, Respondents are instructed—absent further guidance from the Supreme Court—to provide a twenty-one (21) day notice to Petitioners and the provisionally certified class they seek to represent, namely "All noncitizens in custody in the District of Colorado who were, are, or will be subject to the March 2025 Presidential Proclamation entitled Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua and/or its implementation."

Such notice must state the government intends to remove individuals pursuant to the Act and Proclamation. It must also provide notice of a right to seek judicial review, and inform individuals they may consult an attorney regarding their detainment and the government's intent to remove them. Such notice must be written in a language the individual understands. These requirements are reasonable to ensure individuals are "actually inform[ed]," *Mullane*, 339 U.S. at 315, of their rights and the nature of proceedings against them, consistent with Supreme Court precedent on this very issue, and crafted to the "appropriate nature of the case," *see J. G. G.*, 2025 WL 1024097, *2 (quoting *Mullane*, 339 U.S. at 313. *See also id.* ("The notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs.").

*d. Additional Arguments*

Finally, Petitioners argue the Proclamation is unlawful for two "independent reason[s]": that it violates protections for noncitizens seeking humanitarian protection, ECF No. 2 at 17, and violates the INA's "procedural requirements," *id.* at 19 (capitalization omitted). Because Petitioners are likely to succeed on the merits of their claims based on the Proclamation's shortcomings in light of Respondents' deficient notice and the Act's statutory language, the Court need not—and does not—reach their alternative arguments regarding these independent reasons. *See, e.g., Oklahoma v. United States Dep't of the Interior*, 577 F. Supp. 3d 1266, 1278 (W.D. Okla. 2021) ("[I]f it is not necessary to decide more, it is necessary not to decide more." (quotations omitted)).

### C. Irreparable Harm

The parties dispute whether Petitioners will suffer irreparable harm absent a temporary restraining order. *Compare* ECF No. 2 at 20, *with* ECF No. 26 at 15. The Court agrees with Petitioners: Absent a TRO, they face immediate, irreparable harm.

Petitioners are at "significant risk" of summary removal. *See, e.g.,* ECF No. 2 at 20; *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (quotations omitted). This is so because, while they may be "currently" removable under Title 8 and the INA, Respondents declined to definitively conclude—in their briefing or during oral argument—that Petitioners were *not* removable now or later under the Act and Proclamation. And there is nothing stopping the government from re-classifying Petitioners as Proclamation-eligible deportees at any stage in their immigration proceedings, as D.B.U.'s proceedings already suggest. ECF No. 31-2 at 2 ¶ 3. Put differently, Title 8 proceedings do not *eliminate* the risk of irreparable harm that Petitioners would or could be, at any moment, set for deportation and removal under the Act and Proclamation. All the more so where, based on the TRO record, the Notice provides constitutionally deficient process for Petitioners. *See Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016) (noting "the violation of a constitutional right must weigh heavily in that [irreparable harm] analysis" (quotations omitted)); *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019) ("Any deprivation of any constitutional right fits that [irreparable

injury] bill."). Moreover, changing Petitioners' designation as deportable and removable under the Act and Proclamation poses the significant risk they would be removed within twenty-four hours or less with constitutionally inadequate notice.

**\*13** This is not a circumstance, put differently, where the harms Petitioners face are so remote—or are simply monetary—as to fail in establishing they face irreparable harm in the Court's TRO analysis. *See, e.g., id.; Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021), *aff'd in part, rev'd in part and remanded on other grounds*, 27 F.4th 718 (D.C. Cir. 2022) ("Unlike economic harm, the harm resulting from expulsion from the United States pursuant to an unlawful policy likely cannot be remediated after the fact." (citation omitted)). Accordingly, Petitioners have met their irreparable harm burden.

### D. Balanced Equities and Public Interest

According to Respondents, the merged "balancing-the-equities" and "public interest" factors favor the government—and therefore do not favor granting Petitioners' TRO request—because a TRO is "unnecessary" to protect Petitioners, but conversely would "impede the government's ability to enforce the immigration laws and to arrest, detain, and remove unlawfully present aliens who may pose a danger to the public." ECF No. 26 at 16. Petitioners contend these factors favor them because, *inter alia*, the public has a strong interest in preventing wrongful removals, and moreover any TRO does not prohibit Respondents from prosecuting or removing individuals under the INA. ECF No. 2 at 22. The Court agrees with Petitioners.

Absent a TRO, Petitioners face the risk of being deported—perhaps *wrongfully* deported—under the Act and Proclamation in violation of their constitutional rights. Again: How Petitioners are currently classified does not eliminate this risk, when that classification—and the legal framework under which they may be removed—can change at any time. Conversely, Respondents are not prohibited, should a TRO issue, from proceeding to deport and remove individuals under the INA *at all. J.G.G.*, 2025 WL 914682, at \*30 ("The Executive remains free to take TdA members off the streets and keep them in detention. The Executive can also deport alleged members of TdA under the INA ...")

(Millett, J., concurring). Nor would a TRO in this particular case "irreparably harm the United States' conduct of foreign policy." *Cf.* ECF No. 26 at 16; *J.G.G., 2025 WL 890401, at *17*; *J.G.G., 2025 WL 914682, at *21* ("A TRO directing military deployments or maneuvers certainly would raise profound separation of powers questions warranting the most careful consideration and remediation. But nothing remotely like that happened here.") (Millett, J., concurring).

Practically speaking, a TRO would inflict little more on Respondents than ensure they adhere to the requirement the Supreme Court has already imposed on them: give Petitioners and putative class members adequate notice, with adequate time, to adequately pursue habeas relief. *See J. G. G., 2025 WL 1024097, at *2* (per curiam). Ensuring compliance with a pre-existing requirement imposed by the Supreme Court and Constitution, without limiting any powers under an entirely different statutory regime that permits deportations and removals, does not rise to a level of "harm" that outbalances the harm Petitioners face absent the issuance of a TRO in this case at this stage. *See Fish, 840 F.3d at 755* ("There is no contest between the mass denial of a fundamental constitutional right and the modest administrative burdens to be borne by [government officials].") Especially where the countervailing harm Petitioners and the putative class face is violation of their constitutional rights and potentially wrongful removal. *See, e.g., Awad v. Ziriax, 670 F.3d 1111, 1132 (10th Cir. 2012)* ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (quotation omitted)); *Huisha-Huisha v. Mayorkas, 27 F.4th 718, 734 (D.C. Cir. 2022)* ("[T]he Supreme Court has said that the public has a strong interest in 'preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.' ") (quoting *Nken v. Holder, 556 U.S. 418, 436 (2009)*).

\* \* \*

**\*14** The Court is mindful of the differing roles played by three coordinate branches of government. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 483 (2010)* ("Our Constitution divided the powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial." (quotations omitted)).

And Respondents are right: the President has certain powers regarding, for example, foreign policy. *See, e.g., Ludecke, 335 U.S. at 173* ("The Founders in their wisdom made him not only the Commander-in-Chief but also the guiding organ in the conduct of our foreign affairs."). But, exercising its judicial power, *see U.S. CONST. Art. III, § 1*, in this case the Court must ask whether the exercise of those powers comports with the words chosen by Congress in a centuries-old statute and those ratified in our Constitution. *See also Marbury v. Madison, 5 U.S. 137, 177 (1803)*.

Based on the record and parties' arguments, that inquiry yields one answer: Petitioners have met their burden of showing preliminary injunctive relief, in the form of a temporary restraining order, is proper. As such, consistent with *Federal Rule of Civil Procedure 65*, the Court ORDERS the following:

- Respondents shall not move Petitioners and members of the provisionally certified class outside the District of Colorado. Respondents shall provide a twenty-one (21) day notice to Petitioners and members of the provisionally certified class detained pursuant to the Act and Proclamation. Such notice must state the government intends to remove individuals pursuant to the Act and Proclamation. It must also provide notice of a right to seek judicial review, and inform individuals they may consult an attorney regarding their detainment and the government's intent to remove them. Such notice must be written in a language the individual understands. Such notice must be provided to Petitioners and the provisionally certified class they seek to represent, namely: "All noncitizens in custody in the District of Colorado who were, are, or will be subject to the March 2025 Presidential Proclamation entitled Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua and/or its implementation."

- Petitioners, should they choose to do so, shall file a preliminary injunction motion within three days of this Order, by April 25, 2025. Respondents shall file a response to any preliminary injunction motion Petitioners may file by April 30, 2025. Any reply shall be due by May 2, 2025. In their preliminary injunction briefing, the parties are invited to brief the adequacy or burdensomeness of the Court's notice requirement,

detailed above. The Court may or may not in its discretion and after considering those arguments, should the parties choose to advance them, revise such notice requirement, at the preliminary injunction stage. *See, e.g., Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1030 (9th Cir. 1985)*.

• Because this Court's prior order was issued pursuant to the Court's authority under the All Writs Act, *see* ECF No. 10, and the Court's instant Order is issued under Rule 65, the terms of this TRO expire on May 6, 2025. The Court may, in its discretion or at the urging of the parties, extend the terms of this TRO by good cause shown.

• Respondents shall file a response to Petitioners' class certification motion by April 28, 2025. Any reply shall be due by May 2, 2025. Following completion of the parties' class certification briefing, the Court will rule on whether Petitioners have shown that the class's provision certification is proper and thus certification is appropriate under Rule 23, or whether—as Respondents indicated at oral argument—class treatment of Petitioners' claims is improper.

**\*15** • Petitioners are not ordered at this time to issue a security or bond, as determined by the Court in the exercise of its discretion.

• Given Petitioners "do not seek to enjoin the President," the terms of this TRO do not apply to him. *See* ECF No. 2 at 4 n.2 (citation omitted).


### IV. CONCLUSION

Consistent with the above analysis, Plaintiffs-Petitioners' Emergency Motion for Temporary Restraining Order is GRANTED. ECF No. 2.

DATED this 22nd day of April 2025.


### All Citations

--- F.Supp.3d ----, 2025 WL 1163530

End of Document
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit B – Valdez Declaration

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

<table>
<tr><td>

**D.B.U. and R.M.M.**

*Petitioners-Plaintiffs,*

               **v.**

**DONALD J. TRUMP,** President of the United States, et al.

*Respondents-Defendants*

</td><td>

**25-cv-01163-CNS**

<u>**Declaration of Deputy Field Office Director George Valdez**</u>

</td></tr>
</table>

.

I, George Valdez Jr., pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.  I am employed as the Deputy Field Office Director ("DFOD") for the U.S. Department of Homeland Security ("DHS"), U.S Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO") Denver Field Office. I have been employed with ICE ERO since 2011. I have been in my current role as a DFOD with Denver ERO since May 2024. My assigned duties include the oversight of detention operations at the ICE contract detention facility in Aurora, Colorado ("Denver CDF").

2.  I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

3.  I am aware that, on March 15, 2025, President Trump announced the Proclamation *Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua* ("Proclamation"). 90 Fed. Reg. 13,033, 13,033 (Mar. 20, 2025).

4.  The Proclamation states that "all Venezuelan citizens 14 years of age or older who are members of TdA [Tren de Aragua], are within the United States and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." 90 Fed. Reg. at 13,034.

5.  I am aware that the instant habeas proceeding was filed on April 12, 2025, by D.B.U. and R.M.M. ("Petitioners-Plaintiffs") regarding their alleged inclusion in the group of aliens designated under the Proclamation.

6.  I have reviewed the cases of Petitioners-Plaintiffs, both of whom are in custody at the Denver CDF.

7.  Petitioners-Plaintiffs are both natives and citizens of Venezuela who are within the United States and are not actually naturalized or lawful permanent residents of the United States.

**D.B.U.**

8.  On August 19, 2022, U.S. Customs and Border Protection ("CBP") encountered D.B.U. at or near Eagle Pass, Texas, after he waded across the Rio Grande and entered the United States without being admitted or paroled after inspection.

9.  CBP issued an Order of Release on Recognizance ("ORR") and directed D.B.U. to report to ICE.

10. On October 21, 2022, DHS filed a Notice to Appear ("NTA"), initiating immigration court proceedings under 8 U.S.C. § 1229a, before the Executive Office for Immigration Review. The NTA charged D.B.U. with being inadmissible to the United States pursuant to 8 U.S.C. § 1182(a)(6)(A)(i) (alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the [Secretary of Homeland Security]).

11. On January 26, 2025, ICE encountered D.B.U. during an investigation and took custody of him pursuant to 8 U.S.C. § 1226.

12. D.B.U. is in removal proceedings pending before the immigration court.

13. Prior to April 12, 2025, ICE reviewed the facts in D.B.U.'s case and determined that he is not subject to the Proclamation.

14. Consequently, D.B.U. has not been issued a notice that he is subject to the Proclamation.

15. If ICE determines in the future that D.B.U. is subject to the Proclamation, he would be provided notice of such determination in a language he understands. These procedures will allow time and opportunity to file a habeas petition.


**R.M.M.**

16. On November 26, 2023, CBP encountered R.M.M. at or near Eagle Pass, Texas, after he entered the United States without being admitted or paroled after inspection.

17. CBP issued an ORR and directed R.M.M. to report to ICE.

18. On November 28, 2023, DHS filed a Notice to Appear ("NTA"), initiating immigration court proceedings under 8 U.S.C. § 1229a, before the Executive Office for Immigration

3

Review. The NTA charged R.M.M. with being inadmissible to the United States pursuant to 8 U.S.C. § 1182(a)(6)(A)(i) (alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the [Secretary of Homeland Security]).

19. On March 1, 2025, ICE encountered R.M.M. during an investigation and took custody of him pursuant to 8 U.S.C. § 1226.

20. R.M.M.'s removal proceedings are pending before the immigration court.

21. Prior to April 12, 2025, ICE reviewed the facts in R.M.M.'s case and determined that he is not subject to the Proclamation.

22. Consequently, R.M.M. has not been issued a notice that he is subject to the Proclamation.

23. If ICE determines in the future that R.M.M. is subject to the Proclamation, he would be provided notice of such determination in a language he understands. These procedures will allow time and opportunity to file a habeas petition.

24. In the Petition, Petitioners refer to a Form I-213 that was issued to R.M.M. A Form I-213, Record of Deportable/Inadmissible Alien, is a document completed by Department officers and agents based on information gathered upon initial encounter with an alien and from reviewing Department records and other available information. A Form I-213 is not a determination that an individual is subject to the Proclamation. The determination that an individual is subject to the Proclamation is made through a different process.

I declare under penalty of perjury that the foregoing is true and correct.

4

Executed this __the day of April 2025

GEORGE
VALDEZ JR

Digitally signed by
GEORGE VALDEZ JR
Date: 2025.04.17
16:42:27 -06'00'

George Valdez Jr.
Deputy Field Office Director
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security