No. 25-1164

---

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

D.B.U., et al.,
*Appellees - Petitioners,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
et al.,
*Appellants - Respondents.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
No. 1:25-CV-1163-CNS
The Hon. Charlotte N. Sweeney

---

## APPELLEES-PETITIONERS' RESPONSE TO APPELLANTS-RESPONDENTS' EMERGENCY MOTION FOR A STAY PENDING APPEAL

---

## INTRODUCTION

The temporary restraining order ("TRO") here is not appealable, but even if it were, it was proper. When the district court issued the TRO, the government was suggesting that it would provide a mere 24 hours' notice for individuals to contest their designation and removal under the Alien Enemies Act ("AEA"). As the district court correctly held, that time period and an English language form could not be squared with the Supreme Court's ruling that individuals designated under this wartime authority must be given "due process" and notice that will allow them to "actually" seek habeas relief to contest their designation and removal. *See Trump v. J.G.G.*, No. 24A931, 2025 WL 1024097, at *2 (U.S. Apr. 7, 2025). The government has doubled down and since revealed that it adopted a notice period of 12 hours. And if an individual is mistakenly removed to the notorious Terrorism Confinement Center ("CECOT") prison in El Salvador, the government has stated that it will not correct the mistake—meaning these individuals could remain in a brutal foreign prison indefinitely, never having had a chance to show that they do not fall within the Proclamation.

Given such inadequate notice, the government is not likely to succeed in its claim that Appellees-Petitioners ("Petitioners") lacked standing to contest their imminent removal. Moreover, the government is not likely to succeed in its novel claim that the Proclamation satisfies the AEA's statutory predicates despite the

absence an ongoing or threatened *military* invasion or incursion, or a "foreign government or nation." Because Petitioners and the provisionally certified class could otherwise be subject to a life sentence abroad, and the public interest lies in respecting the bounds of the AEA and Constitution, the Court should deny a stay pending appeal.

## BACKGROUND

### I.    The Alien Enemies Act

The AEA is a wartime authority. Passed in 1798, the AEA, as codified today at 50 U.S.C. § 21, provides:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

This Act has been used only three times in the country's history and each time in a period of war: the War of 1812, World War I, and World War II.

### II.    The AEA Proclamation and Unlawful Removals

On March 14, 2025, the President signed a proclamation entitled: "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua," https://perma.cc/ZS8M-ZQHJ ("Proclamation"). It provides that "all

Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *See* Proclamation. It authorizes summary removals, bypassing the immigration laws Congress has enacted providing a right to seek protection from persecution and torture. *See, e.g.*, 8 U.S.C. §§ 1158, 1231(b)(3), 1231 note. Hours after the Proclamation was published on March 15, over 130 Venezuelan men—who, like Petitioners here, were accused of TdA affiliation—were swiftly removed despite having pending asylum applications and immigration court dates. The government removed them to a notoriously brutal prison in El Salvador, where they remain incommunicado to this day.

In *J.G.G.*, the Supreme Court held that challenges to removal under the AEA must be brought in habeas in their district of confinement but that the government "must" provide notice and "in such a manner as will allow them to *actually* seek habeas relief." 2025 WL 1024097, at *2 (emphasis added). The government originally responded that 24 hours' notice was sufficient to comply with the Court's directive, but on April 23, it filed a sealed declaration in the Southern District of Texas (immediately unsealed by the court) reducing the time to 12 hours for individuals to indicate that they wish to contest, and then another 24 hours to file a

habeas petition. *See* ECF No. 44-1 (Cisneros Declaration and Form AEA-21B).[1] Besides filing the declaration (under seal) in that court, the government did not alert any other court, including the Supreme Court or this Court, about the 12-hour policy or any other significant aspects of its notice protocols, even though these courts are currently considering the identical notice issue and doing so on an expedited basis. *See, e.g.*, *A.A.R.P. v. Trump*, No. 24A1007, 2025 WL 1147581, at \*1 (U.S. Apr. 19, 2025).

The result of the government's notice procedures has been sheer chaos, with an attempt to evade judicial scrutiny. Given the deficient notice procedures, several courts, like the one here, have issued district-wide class habeas TROs to preserve the status quo given the risk that individuals would be removed to the notorious CECOT prison. As these courts have noted, the need to preserve the status quo is particularly acute given the government's position that even those mistakenly sent to El Salvador will not be returned.  *See Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, at \*2 (4th Cir. Apr. 17, 2025); *see also G.F.F. v. Trump*, No. 25 CIV. 2886, 2025 WL 1166911, at \*1 (S.D.N.Y. Apr. 11, 2025); *J.A.V. v. Trump*, No. 1:25-CV-072, 2025 WL 1064009, at \*2 (S.D. Tex. Apr. 9, 2025); *A.S.R. v. Trump*, No. 3:25-CV-00113-SLH, 2025 WL 1122485, at \*1 (W.D. Pa. Apr. 15, 2025); Mem. Op. & Order,

---

[1] ECF No. cites refer to the district court docket below unless otherwise indicated. "Mot." refers to the government's motion for a stay. Page cites are to the pagination of the brief.

*Sanchez Puentes v. Garite*, No. 25-cv-127-DB (W.D. Tex. Apr. 25, 2025), ECF No. 27 at 19.

The Northern District of Texas, however, had no injunction, and in mid-April, the government transferred dozens of Venezuelan men from detention centers across the country to the Bluebonnet Detention Center in that district. A district-wide TRO request followed. *See* Mot. For TRO, *W.M.M. v. Trump*, No. 25-cv-59-H (N.D. Tex. Apr. 16, 2025), ECF No. 2. The government responded that it would not remove the two named petitioners pending the outcome of the petition. *See id.*, ECF No. 19 at 13. Although the government made no similar representations about the putative class, the district court assumed, based on "the Supreme Court's opinion in *J.G.G.*, along with the government's general representations about the procedures necessary in these cases," "that the putative class is also not facing such an imminent threat as the petitioners allege," and on that basis denied a TRO. *See id.*, ECF No. 27 at 9.

Within hours of the denial on April 17, ICE began distributing deficient AEA notices and informing individuals that they would be deported imminently. *See* ECF No. 31 at 2. The following day, men were loaded on vehicles that left the detention center, only to turn around shortly after petitioners sought a stay of removal from the Fifth Circuit and Supreme Court. *Id.* at 1, 3. Around 1 a.m. on Saturday, April 19, the Court issued a stay of removal for those petitioners and the putative class of detainees in the Northern District of Texas. *See A.A.R.P.*, 2025 WL 1147581, at *1.

### III.    Procedural History

Petitioners are two Venezuelan men detained at the ICE Denver Contract Detention Facility in Colorado. ECF No. 35 at 5-7. D.B.U. was arrested at what ICE characterized as a "Tren de Aragua party," after which agents interrogated him regarding his possible TdA membership, while R.M.M. was collaterally arrested during an ICE operation against an individual allegedly named in a TdA investigation. *Id*. Neither has been criminally charged. *Id*. In their immigration proceedings, where they are seeking asylum and other protections, the government has argued that they have gang affiliations; both deny any connection with TdA. *Id*.; ECF No. 31 at 4.

On April 12, Petitioners filed a class habeas petition and complaint, emergency motion for a TRO, and motion for class certification. On April 14, citing the All Writs Act and need to preserve the court's jurisdiction, the district court issued two orders, the first temporarily enjoining Appellants-Respondents ("Respondents") from removing the named Petitioners and the second governing the putative class. ECF Nos. 10, 14. The district court subsequently granted a TRO, provisionally certified the class, and ordered Respondents to provide a 21-day notice ahead of removal. ECF No. 35 at 34. Petitioners filed their motion for a preliminary injunction on April 25, and briefing is scheduled to be completed by May 2—several days before the renewed TRO is set to expire on May 6. *Id*.

## LEGAL STANDARD

If the Court concludes it has jurisdiction over the TRO, the government must establish: "a strong showing that [it] is likely to succeed on the merits;" "whether the [government] will be irreparably injured absent a stay;" "whether issuance of the stay will substantially injure the other parties interested in the proceeding;" and "where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). "[M]ore than a mere possibility" of success on the merits and irreparable injury is required. *Id.* at 434-35. A "stay is not a matter of right, even if irreparable injury might otherwise result." *Id.* at 433.

## ARGUMENT

### I.    The Court Lacks Jurisdiction Over This Appeal.

As the government acknowledges, TROs are "not ordinarily appealable." Mot. 5 (quoting *Tooele Cnty. v. United States*, 820 F.3d 1183, 1186-87 (10th Cir. 2016)). No exception to that rule applies here.

A court may enter a TRO without notice for 14 days, unless before its expiration, "the court, for good cause, extends it for a like period." Fed. R. Civ. P. 65(b)(2). The government's reliance on *Tooele County* to equate this TRO to a preliminary injunction is mistaken. There, this Court found appellate jurisdiction because the order "would remain in effect until the court decided whether to grant an injunction." 820 F.3d at 1187 (criticizing TRO as an "indefinite" injunction).

Here, the district court carefully followed Rule 65(a) and issued an initial TRO under the All Writs Act to immediately preserve its jurisdiction, ECF Nos. 10, 14, followed by another "like period" of 14 days for good cause, along with an expedited preliminary injunction schedule set to conclude within that 14-day period, ECF No. 35 at 34. There is no reason for this Court to short-circuit the usual process and review this case on a less fulsome record.[2]

The government contends that the orders prevent enforcement of the AEA in a "jurisdiction rife [sic] criminal TDA activity," Mot. 6, but nothing in the orders prevents criminal prosecutions, detention or removal under the immigration laws. Similarly, the government only asserts that halting removals "may" forever stymie them. *Id.*; *see S. Wind Women's Ctr. LLC v. Stitt*, 808 Fed. App'x 677, 681 (10th Cir. 2020) (rejecting assertion that "even two weeks of undermining the state's response to the pandemic would be truly irremediable"). In short, the government has identified nothing that makes this "the rare case" for review of a TRO for mandamus

---

[2] Respondents point to *J.G.G. v. Trump*, but the issue in need of immediate resolution there was whether a nationwide APA class action should proceed. Additionally, the tiebreaking vote in the Circuit interpreted the district court's order as enjoining the President, No. 25-5067, 2025 WL 914682, at *13 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring), which is not the case here, *see* ECF No. 35 at 35. Moreover, the TRO here poses no irrevocable harm to the government. *Contra Adams v. Vance*, 570 F.2d 950, 953 (D.C. Cir. 1978) (TRO required the Secretary of State to make a statement).

relief, an "extraordinary remedy reserved for really extraordinary causes." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004).

## II.    Respondents Fail to Establish Entitlement to Extraordinary Relief.

### A. Respondents Are Not Likely to Prevail in Showing that the District Court Lacked Jurisdiction.

As the district court correctly recognized, courts "have very liberally construed the 'in custody' requirement for purposes of federal habeas." *Maleng v. Cook*, 490 U.S. 488, 492 (1989); *see* ECF No. 35 at 13.[3]  Respondents rely on *Maleng* to assert that petitioners must be "in custody under the conviction or sentence the petitioner is attacking," Mot. 9, but the Supreme Court stated the opposite: "[Its] interpretation of the 'in custody' language has *not required* that a prisoner be physically confined in order to challenge his sentence on habeas corpus." 490 U.S. at 491 (emphasis added). For that reason, the Court held that the petitioner could challenge the *future* sentences imposed on him, even though he was "not presently serving them." *Id*. at 493; *see also id*. (citing *Peyton v. Rowe*, 391 U.S. 54, 88 (1968); *Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 488-89 (1973)).

---

[3] Respondents assert that Petitioners have not identified habeas as a jurisdictional basis, but even the page they cite references habeas. *See* Mot. 8 (citing Exh. A at 5); *see also* ECF No. 1, ¶¶ 8, 97-98.

Likewise, Petitioners and the putative class challenge the government's current or imminent detention and removal pursuant to the AEA. One of their claims is that Respondents are not providing adequate notice or opportunity to contest their AEA designation. As demonstrated by recent events, the government can at any moment designate Petitioners and attempt to whisk them out of the country before they obtain judicial review. If the government's position were accepted and individuals in this situation had to wait until they were designated, the opportunity for judicial review could be lost forever. *See Gerstein v. Pugh*, 420 U.S. 103, 111 n.11 (1975) ("The claim, in short, is one that is distinctly 'capable of repetition, yet evading review.'"); *United States v. Sanchez-Gomez*, 584 U.S. 381, 388 (2018) ("The exception applies when the pace of litigation and the inherently transitory nature of the claims at issue conspire[.]").

Respondents mistakenly rely on an entirely different line of cases where the Court explained that the "in custody" requirement was not met where individuals *finished* serving a sentence, even if that prior conviction could be "used to enhance the sentences for any subsequent crimes." *Maleng*, 490 U.S. at 492; *Davis v. Roberts*, 425 F.3d 830, 834 (10th Cir. 2005) (same); *Mays v. Dinwiddie*, 580 F.3d 1136, 1141-42 (10th Cir. 2009) (same); *see also Alaska v. Wright*, 593 U.S. 152, 154 (2021) (state

conviction that served as a predicate for federal conviction does not render one "in custody" of state).[4]

The government's arguments are ultimately about standing, contending that Petitioners' claims are "speculative" and "unripe," Mot. 10, but Petitioners have established a "substantial risk the threatened harm will occur"—that, absent relief, they will be designated and summarily removed under the Proclamation. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 164 (2014) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). The government has issued both Petitioners I-213 Forms alleging they are members of or affiliated with TdA, and it has reiterated those claims in immigration court. *See* ECF No. 31-2 ¶ 3; ECF No. 2-2, ¶¶ 5-6. *see Frank v. Lee*, 84 F.4th 1119, 1134 (10th Cir. 2023) ("a credible threat of prosecution can be found where no actual threats have been made"). The Proclamation applies to *all* alleged TdA members and the government's criteria for designating individuals is notoriously permissive. *See* ECF No. 45, Exh. H, at Exh. 1, 14.

While the government states that it has not currently designated Petitioners under the AEA, Mot. 3, it has not foreclosed the possibility for the future, ECF No.

---

[4] Respondents rely on *Rumsfeld v. Padilla*, but there, the Court rejected the "extraordinary proposition" that habeas jurisdiction could be exercised on the *theory* that the petition *could* have been filed earlier in the district court, even though the petitioner was not in the district at the time of filing. 542 U.S. 426, 448 (2004). That speaks nothing to *imminent* harm or detention.

26-1, ¶¶ 15, 23, nor even provided reassurances that it would not remove them pending this litigation, in contrast to other cases. *See Bronson v. Swensen*, 500 F.3d 1099, 1108 (10th Cir. 2007) (standing is more likely when plaintiffs lack assurances against prosecution.). And its recent actions in Texas show that any implicit or assumed assurances are not sufficient. Under these circumstances, Petitioners have shown far more than the "substantial risk" of injury required. Respondents' argument that notice is sufficient is wholly circular as it would mean no one would have an opportunity to access the courts because they are either too early and without injury, or too late and the government has no ability to rectify their wrongful removal.

### B. Respondents' Arguments on the Merits Fail.

#### 1. The Notice Procedures are Deficient.

"[N]otice and a meaningful opportunity" to contest the government's charges before liberty is deprived lies at the heart of due process. *LaChance v. Erickson*, 522 U.S. 262, 266 (1998). That is especially critical here, where the government has made mistakes yet taken the extraordinary position that it need not fix them. Given what is at stake, the Supreme Court made unequivocally clear that individuals designated under the AEA are entitled to "due process" and "notice and opportunity to be heard." *J.G.G.*, 2025 WL 1024097, at *2 (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). The Court stated that not only must individuals get notice, but that "notice

12

must be afforded within a reasonable time and in such a manner as will allow them to *actually* seek habeas relief." *Id*. (emphasis added).

The government suggests its notice protocols satisfy the Court's ruling, Mot. 17-19, but under no conceivable understanding of the Court's ruling can that be correct.  First, the notice form is only in English. ECF No. 44-1 at 5. Even if it is translated, which in practice it has not been, *see* Suppl. App. 2a ¶ 7, *A.A.R.P. v. Trump*, No. 24A1007 (U.S. Apr. 21, 2025), it still would be deficient, because individuals would have to remember everything that was told to them, during a terrifying, rapid process.  Moreover, the notice form does not tell individuals they have the right to contest the designation, much less how to do so or how long they have to do so. ECF No. 44-1 at 5. The government thus expects scared immigrants with little to no understanding of English or the American legal system, to comprehend that they must specifically state they want to file a habeas petition, and then file that petition.  *See Mullane*, 339 U.S. at 315 (the "means employed must be such as one desirous of actually informing" of the individual's rights).

Most egregiously, the government is providing virtually no time for these individuals to understand what is happening to them and seek advice from a lawyer, much less to actually retain a lawyer and get into court before they are loaded onto a plane. Around 85 percent of the class is unrepresented. ECF No. 31-2 ¶ 4. The government provides 12 hours "to indicate or express an intent to file a habeas

petition." ECF No. 44-1, ¶ 11. If the individual does express an intent to file a habeas petition, ICE provides 24 hours to actually file the petition. *Id.* Practically speaking, individuals would not only need to file a habeas petition but also a TRO request. *See Lane Hollow Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 137 F.3d 799, 807 n.14 (4th Cir. 1998) (collecting cases holding that several days' notice does not satisfy due process); *Francis v. Fiacco*, 942 F.3d 126, 143-44 (2d Cir. 2019) ("merely notifying a prisoner . . . and then placing upon him the burden of navigating the legal system, from his prison cell and without counsel, does not satisfy" due process). It also falls short because individuals are not informed of the "factual basis" for their designation. *See Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014). Nor, critically, the notice does not tell individuals that although they are Venezuelan, they may be removed to El Salvador or inform them of how to contest that aspect.

The government states that the political branches generally have plenary power over immigration policy. Mot. 19. But the Supreme Court has already held that in *this* context, involving a wartime authority and individuals being sent to a foreign prison, individuals are entitled to due process and notice sufficient to allow them to actually contest being labeled "enemy aliens." *J.G.G.*, 2025 WL 1024097, at *2. For the same reason, the government's attempt to analogize the use of this wartime authority to the expedited removal procedures in immigration law is

misplaced. Mot. 18-19.[5] In short, 12 hours would be unreasonable under any

circumstances but it is especially unreasonable here given the nature of the class and

the consequences of ending up in a Salvadoran prison for the rest of their lives.

### 2. The Proclamation Does Not Comport With the AEA.

The Court should also find that the government is not likely to succeed

because the AEA is a wartime measure that cannot be used where, as here, there is

no "invasion or predatory incursion," let alone one perpetrated by a "foreign nation

or government." 50 U.S.C. § 21; *see, e.g.*, ECF No. 35 at 21-26; *J.G.G.*, 2025 WL

914682, at *5-10 (Henderson, J., concurring) (AEA predicates of "invasion" or

"predatory incursion" not met); *see also Util. Air Regul. Grp. v. EPA*, 573 U.S. 302,

---

[5] Even if immigration proceedings were an apt analogy to the use of a wartime authority, expedited removal is a non-adversarial administrative proceeding where immigration officers generally make simple and frequently uncontested determinations, *e.g.*, is the noncitizen seeking admission without valid documents? *See* 8 U.S.C. §§ 1225(b)(1)(A)(i), 1182(a)(7). And noncitizens who assert a fear of return are entitled to a more substantial procedure including: (1) "information concerning" the asylum screening process and a meaningful opportunity to "consult" with an attorney or other individual in advance, 8 U.S.C. § 1225(b)(1)(B)(iv); (2) a "nonadversarial" interview with a trained asylum officer, 8 C.F.R. § 208.9(b), with a "written record," 8 U.S.C. § 1225(b)(1)(B)(iii)(II), subject to a statutorily mandated "low screening standard," *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020); and (3) review by an immigration judge, 8 C.F.R. § 1208.30(g)(2). Respondents focus on the statutory provision addressing how long the immigration judge should take in concluding that final step, Mot. 18 (quoting 8 U.S.C. § 1225(b)(1)(B)(iii)(III)), but that language about how long the final *adjudicator* should take says nothing about how much notice noncitizens are entitled. Nothing in this process remotely suggests 12 hours' notice, with no administrative or judicial review, could satisfy due process.

324 (2014) (When the government asserts "an unheralded power" in a "long-extant statute," courts "greet its announcement with a measure of skepticism.").

Respondents briefly argue that whether the statute's preconditions have been met is "not subject to judicial review." Mot. 12. But the Supreme Court has foreclosed that argument. *J.G.G.*, 2025 WL 1024097, at *2 ("'questions of interpretation and constitutionality' of the Act" are reviewable) (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163, 172 n.17 (1948)); *see also J.G.G.*, 2025 WL 914682, at *6-7 (Henderson, J. concurring). Indeed, *Ludecke* itself reached the merits of the statutory question presented there: whether a "declared war" no longer existed within the meaning of the Act when "actual hostilities" had ceased. 335 U.S. at 161, 166-70. The Court concluded, on the merits, that the statutory term "declared war" did not mean "actual hostilities," and that war continues for purposes of the AEA until the political branches declare it over. *Id.* at 170 & n.15. Four years later, the Court reversed a World War II removal decision because "[t]he statutory power of the Attorney General to remove petitioner as an enemy alien ended when Congress terminated the war." *U.S. ex rel. Jaegeler v. Carusi*, 342 U.S. 347, 348 (1952).[6]

Respondents' merits arguments fare no better. *First*, as Judge Henderson explained, there is no "invasion" or "predatory incursion" upon the United States.

---

[6] *See* ECF No. 31 at 6-7 (collecting cases reviewing AEA's terms). Respondents also cite *Citizens Protective League v. Clark*, a pre-*Ludecke* decision that, in any case, reached the merits. 155 F.2d 290, 292, 295 (D.C. Cir. 1946).

*J.G.G.*, 2025 WL 914682, at *8-10. Her concurrence thoroughly recounts how contemporaneous dictionary definitions, historical resources, and the Constitution make clear that Congress understood those terms to mean a military intrusion into the U.S. territory. *See id.*; *see also* ECF No. 35 at 22-24 (discussing sources); ECF No. 2 at 12-14 (same).[7] Tellingly, the AEA requires that the predicate invasion or predatory incursion be "against the territory of the United States." 50 U.S.C. § 21. And at the time of founding, actions "against the territory of the United States" were expressly understood to be military in nature. *See, e.g.*, *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 131 (1807); *J.G.G.*, 2025 WL 914682, at *1 ("In 1798, our fledgling Republic was consumed with fear . . . of external war with France.").

Respondents argue that a "predatory incursion" is *any* "entry into the United States . . . for purposes contrary to the interests or laws of the United States." Mot. 13. But they muster only two inapposite cases for this shockingly broad, unsupported definition: *Amaya v. Stanolind Oil & Gas Co.,* used the term "predatory incursion" to describe military actions by a sovereign nation, Mexico, into Texas. 62 F. Supp. 181, 189-90 (S.D. Tex. 1945). In *Davrod Corp. v. Coates*, the statute at issue did not use the term "predatory incursion" at all, and the court's use of the term in passing

---

[7] Respondents' lone case to support their invasion theory, *United States v. Texas*, 719 F. Supp. 3d 640, 681 (W.D. Tex. 2024), supports Petitioners. The cases and dictionary definitions it summarizes confirm the military meaning of "invasion" as used by Congress at the founding. *See id*.

in 1992 sheds little light on its meaning in the AEA in 1798. 971 F.2d 779, 785 (1st Cir. 1992).

Contrary to Respondents' arguments, Mot. 13-14, illegal migration and criminal activities, as described in the Proclamation, plainly do not fall within the statute. The Proclamation makes no findings that TdA is acting as an army or military force. Nor does the Proclamation assert that TdA is acting with an intent to gain a territorial foothold in the United States for military purposes. *See J.G.G.*, 2025 WL 914682, at \*7 (Henderson, J., concurring) (rejecting government's position that illegal immigration constitutes an invasion).

*Second*, by no stretch of the statutory language can TdA be deemed a "foreign nation or government."[8] The district court correctly pointed out that not even the Proclamation finds TdA itself to be a "foreign nation or government." ECF No. 35 at 26. As a criminal gang, TdA possesses neither a defined territory nor any legal authority. ECF No. 2 at 15-16 (citing experts). The Proclamation does *not* say that TdA operates as a government in those regions, nor that TdA currently controls *any* territory in Venezuela. Respondents' alternative theory—that TdA has sufficient "connections" with the Maduro regime, Mot. 15—only highlights how the AEA is being misused. The Proclamation designates TdA "members" as alien enemies, but

---

[8] Dictionary definitions and historical sources also buttress the meaning of "foreign nation" and "government," as briefed more fully in Petitioners' motion for preliminary injunction. *See* ECF No. 45-1 at 19-20.

"members" are not "natives, citizens, denizens, or subjects" within the meaning of the statute. These glaring mismatches underscore that Respondents are attempting to use the AEA in a way that Congress never permitted—as a mechanism to address, in the government's own words, a *non*-state actor. *Venezuela* has natives, citizens, and subjects, but TdA (not Venezuela) is designated under the Proclamation.

Finally, Respondents cannot elide these statutory bounds by pointing to the President's inherent Article II power. Mot. 14-15. Congress, not the President, holds plenary power over immigration. *INS v. Chadha*, 462 U.S. 919, 940 (1983). The AEA operates as a specific delegation of authority from Congress to the President, one limited to instances of war or imminent war by a foreign nation or government. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (President's power at its "lowest ebb" where contrary to statute enacted by Congress).

## III. Respondents Do Not Establish Irreparable Harm and The Balance of Factors Weigh Heavily Against A Stay

Respondents make no credible attempt to demonstrate that a TRO is not necessary in order for Petitioners to avoid "irreparable harm if they are expelled to places where they will be persecuted or tortured." *Huisha-Huisha v. Mayorkas*, 24 F.4th 718, 733 (D.C. Cir. 2022).[9] Nor can they, given the track record of invoking

---

[9] The district court's class-wide order was appropriate and not overbroad. Mot. 21. This Court has affirmed class-wide relief in this posture involving preliminary relief. *See Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. & Rehab. Servs.*, 31 F.3d

the AEA to send people to places where they will face life threatening conditions, persecution, and torture in places like CECOT. *Supra*.

Conversely, the government can make no comparable claim to harm. *See Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("It is always in the public interest to prevent the violation of a party's constitutional rights."); *Wages & White Lion Inv., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) ("There is generally no public interest in the perpetuation of unlawful agency action."). The government retains the ability to prosecute criminal offenses, detain noncitizens, and remove noncitizens under existing statutory immigration laws. *See e.g.*, 8 U.S.C. §§ 1158(b)(2)(A)(ii)-(iii) (bar on asylum if convicted of particularly serious crime or if "serious reasons to believe" they "committed a serious nonpolitical crime" outside the U.S.); 8 U.S.C. § 1231(b)(3)(B)(ii)-(iii) (same for withholding); *see also* 8 U.S.C. §§ 1226(c), 1231(a)(6).

Respondents' reliance on *Nken* is misplaced not only because the Supreme Court there stated there is a public interest in preventing immigrants from being *wrongfully* removed, particularly to countries where they face substantial harm, but also because the Court relied on the government's concession that individuals could return to the U.S. if they prevailed. 556 U.S. at 435. Without more, Respondents fall

---

1536, 1548 (10th Cir. 1994) (affirming preliminary injunction to putative class and holding that a class certification was not necessary); *Battle v. Anderson*, 564 F.2d 388, 401-02 (10th Cir. 1977) (affirming injunctive relief for incarcerated class).

back on conclusory statements about harm to foreign policy. *J.G.G.*, 2025 WL 914682, at \*11 (Henderson, J., concurring) ("Equity will not act 'against something merely feared as liable to occur at some indefinite time.") (citation omitted). But that pales in comparison to the concrete harms Petitioners face.

## CONCLUSION

The Court should deny Respondents' motion for a stay.

Dated: April 26, 2025

*s/ Lee Gelernt*
Lee Gelernt
Daniel Galindo*
Ashley Gorski
Patrick Toomey
Omar Jadwat
Hina Shamsi*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org

Noelle Smith*
Oscar Sarabia Roman
My Khanh Ngo*
Spencer Amdur
Cody Wofsy
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org
samdur@aclu.org
cwofsy@aclu.org

Timothy R. Macdonald
Sara R. Neel
Emma Mclean-Riggs
Anna I. Kurtz
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF COLORADO
303 E. 17th Avenue
Denver, CO 80203
303-777-5482
sneel@aclu-co.org
tmacdonald@aclu-co.org
emcleanriggs@aclu-co.org
akurtz@aclu-co.org

Attorneys for Appellees-Petitioners

*Attorney's admission to the Tenth Circuit
Court's bar pending

**CERTIFICATE OF COMPLIANCE WITH RULES 27 AND 32(a)**

This response complies with the type-volume limitation set forth in Federal Rules of Appellate Procedure 27(d)(2)(A). It contains 5,190 words.

This response complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point font.

Dated: April 26, 2025

*/s/ Lee Gelernt*

Lee Gelernt
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org